F. T WARLICK v. PETER WHITE and wife, and others.

*Evidence — Character — Legitimacy.*

1. The mother of a child, her husband the alleged father being dead, is a competent witness upon the question of legitimacy.

2. When the point in issue is the legitimacy of a child, evidence offered to prove the bad character of the mother for chastity during the life time of the husband and before the birth of the child, is incompetent. But evidence offered to show her bad character for truth is competent.

3. In the trial of an action involving the legitimacy of a child, who is alleged to be of mixed blood, it is not improper to exhibit such child to the jury.

(*State* v. *Woodruff*, 67 N. C. 89, cited and approved.)

CIVIL ACTION, tried at Fall Term, 1876, of CATAWBA Superior Court, before *Buxton, J.*

The case substantially states the following : F. T. Warlick the beneficial plaintiff claimed title to an undivided half of a tract of land which formerly belonged to Joseph Carpenter, deceased. Plaintiff claimed as assignee of Mrs. Catharine Eaton, the sister and only heir-at-law of said Carpenter. The defendant's wife, Naomi White, before her marriage to said White, was the widow of said Carpenter and claimed title to an undivided half of said land under the will of her former husband. The defendant and his wife were in possession of the whole tract, Naomi claiming one-half in her own right an' *the* other in right of her daughter Sarah J. Carpenter, w' it was alleged was the sole heir of said Joseph Carpe; . Sarah was born shortly after the death of said Joseph her father, and is a minor and one of the defendants in t' action. Her legitimacy was a matter of controversy between the parties. Upon this point the decision of this Court is based, and the opinion delivered by Mr. Justice R n contains a sufficient statement of the facts.

Under the instructions of His Honor in the Court below the jury found the said Sarah was the child of Joseph Carpenter. Verdict for defendants and judgment in accordance therewith. ·Appeal by plaintiff.

*Messrs. J. F. Hoke* and *M. L. McCorkle*, for plaintiff.
*Messrs. Folk & Armfield*, for defendant.

RODMAN, J.   1. The plaintiff having introduced evidence tending to prove that Sarah, one of the defendants was illegitimate and not the heir of Joseph Carpenter, the defendant, Naomi, the mother of Sarah, was allowed to testify that she had been faithful to the said Joseph during his life and that no person but him could have been the father of the child.   To this evidence the plaintiff excepted.   As the disqualification of interest does not now exist, we see no ground for the exception.   It would be hard upon the defendant Naomi, if her evidence could not be heard on such a point.

2. By way of ·impeaching the evidence of the defendant Naomi, the plaintiff offered a witness to prove her general character.   The defendant objected to the witness being allowed to speak of any reports growing out of the matter in controversy.   The plaintiff then proposed to ask the witness "what was the general character of Naomi White in 1864 and 1865," (July, 1865, was the date of the birth of the child Sarah, whose legitimacy was in dispute.)   The Judge excluded the question in the form ˚proposed, but allowed the plaintiff to inquire into the general character of Naomi previous to the birth of the child and as to her character since that time, except as it might be affected by that event.   The plaintiff excepted.

It does not appear from the question, whether it was intended to apply to her character for truth or for chastity.   In its form it covers both.   As Naomi was a witness, we think her general character for truth might be inquired into, as of

the time when she testified. If the witness should say that her reputation was bad in that respect at the time of her testifying, it would be open to the defendants to prove by cross-examination or otherwise that her reputation had been made bad by reason of the charges made by the plaintiff, or by Lawson Carpenter or others, respecting the legitimacy of the child and that it was good before. If that appeared, it is reasonable to suppose that the evidence would have no weight with the jury because it would tend to establish the fact in controversy (the illegitimacy of the child) by a reputation based on the presumption of such illegitimacy. We cannot say however that the general reputation of the witness for truth at the time of her testifying could be excluded. It would be for the jury to say what weight it should have under all the circumstances. A different rule would apply as to the reputation of the defendant Naomi for chastity. It is clear that a reputation for want of chastity, acquired (if such was acquired at all) after the death of Joseph Carpenter, would not be competent upon the question of the legitimacy of her child begotten during his life time. And although it is not so clear we think that such a reputation existing during his life time, would not be competent for the purpose of disproving legitimacy.

When the husband had access, the presumption of paternity is very strong, though not absolutely conclusive. It can only be met by proof that it was impossible that he could have been the father of the child, as in this case it is attempted to be, by proof of the color of the child. As the question covered the whole general character, or more properly general reputation of the witness, we think it was properly refused. The character of Naomi was in issue only by reason of her being a witness. There was nothing in the nature of the action to put her character in issue otherwise.

3. Joseph Carpenter and his wife, the defendant, Naomi were whites.

12

The plaintiff alleged and gave evidence tending to prove that the defendant Sarah was of mixed blood and therefore could not be the child of said Joseph. She was examined by experts who testified on the trial and differed in their opinions. The plaintiff then proposed to exhibit the said Sarah to the jury, for the purpose of aiding them by her appearance, in deciding whether she was of mixed blood or not. The plaintiff did not propose otherwise to examine her as a witness. The defendants objected and the Judge sustained the objection and refused to order the said Sarah to be placed on the witness stand, for the purpose proposed. The plaintiff excepted.

We think that the plaintiff was entitled to exhibit Sarah to the jury in the manner proposed. It is said that such an exhibition to be useful, must be such as would be indelicate and even indecent. Mr. Folk produced from Coke an instance where a woman, whose then pregnancy was in issue, was permitted by an inferior Court to expose herself to the jury and the Superior Court justly condemned it as indecent. We need not fear that any indecent or indelicate examination would be permitted by the Superior Courts of this State. No such thing was proposed, and we confine ourselves to holding, that what was proposed should have been allowed. No question arises as to the manner in which the attendance of the defendant for the purpose proposed might be enforced. It appears that she was present in Court under a subpœna. If however an infant who was a proper witness should neglect to obey a subpœna, a Court would have no difficulty in enforcing her attendance by a writ of *habeas corpus ad testificandum*, directed to the mother or other person having control of her person.

We proceed to consider the question as to whether the Court should have required the defendant Sarah to appear on the witness stand for the purpose proposed. In its exact

WARLICK *v.* WHITE.

shape the question is a novel one and we know of no case like it.

On general principles it would seem that when the question is whether a certain object is black or white, the best evidence of the color would be the exhibition of the object to the jury. The eyes of the members of the jury must be presumed to be as good as those of medical men. Why should a jury be confined to hearing what other men think they have seen and not be allowed to see for themselves.

> "Aut agitur res in scenis, aut acta refertur.
> Segnius irritant animos demissa per aurem,
> Quam quæ sunt oculis subjecta fidelibus, et quæ
> Ipse sibi tradit spectator." *Hor. ad Pisones.*

Juries of view in proper cases are familiar. Maps and plans are exhibited to the jury when the land is not accessible, so are models of machines in patent cases, &c. Nor are direct authorities wanting. In *State* v. *Woodruff*, 67 N. C. 89, the question in the Court below being on the paternity of a child, the mother was examined as a witness and during her examination held the child in her arms in view of the jury and the Solicitor called the attention of the jury to its features, and in his address commented on the child's resemblance to the putative father. The Judge told the jury that they might take into consideration the appearance of the child and give it such weight, &c. The opinion of this Court was delivered by Boyden, J. whose experience as a member of the bar was probably greater than that of any other man in the State. After distinguishing the question from one as to the genuineness of hand-writing, he says: "But when the question is as to the identity of a party or his resemblance to other persons, the law has very properly adopted a different rule of common sense and common observation, and it allows all persons to testify to such identity or to such resemblance, who have had an opportunity of

---
---

seeing the persons if but for an instant." * * * " Then why should not the jury be permitted (when they have the opportunity) to see for themselves and draw their own conclusions from their observation, as well as to hear witnesses depose as to their observation made in the same way? It certainly has been the practice to admit such evidence on the trial of such cases * * * for more than forty years without objection."

In the *People* v. *Gardiner,* in the Supreme Court of N. Y. at General Term, 6 Parker's Crim. Cases, 155, it was held that the Court below did not err in permitting the District Attorney to show to witnesses in the presence of the jury, clothes found on the dead body of Mulock, whom it was alleged the prisoner murdered, and also a hat and gun found near the dead body, and a watch which Mulock had on his person when he disappeared and which was subsequently traced to the possession of the prisoner. On that trial the District Attorney was allowed also to show to the jury the skull of Mulock and to compare the fractures on it with the broken gun found beside his body in order to show how nicely parts of the gun-lock and sight on the gun fitted the indentations or fractures in the skull. The following authorities are cited in that case: *People* v. *Larned,* 3 Selden, 445; *Milhado* v. *Brooklyn City R. R. Co.,* 30 N. Y. 370; *People* v. *Kennedy,* 32 N. Y. 141, 5 Cush. 295; Burrill on Circumstantial Evidence, 2 Ed. §§ 135, 137, 259, 264, and Starkie on Ev. §§ 90, 91.

In the famous Tichborne case, my knowledge of which is confined to what is to be found in 8 American Law Review, 381 (April 1874,) a person claiming to be Sir Roger Tichborne brought suit to recover certain lands which were the acknowledged property of the said Sir Roger if he was living. On the trial he swore to his identity with Sir Roger Tichborne, and he was afterwards indicted for perjury in so swearing. On the trial of the indictment, the only question

WARLICK *v.* WHITE.

was as to the identity of the defendant with Sir Roger Tichborne. Evidence was given of certain marks on the person of the true Sir Roger, and as to their being found or not on the person of the defendant, who during the trial was at the bar of the Court and visible to the jury. One Brown, a witness for the defendant, stated that Sir Roger had a peculiar malformation of the thumb on the *right* hand. He was asked to look at the defendant's thumb. The defendant extended his *left* hand and the witness professed to recognize on it the peculiar malformation he had spoken of as being on the right hand of Sir Roger. It does not appear but that the defendant voluntarily exhibited his hand, but it can scarcely be doubted that if he had refused, he would either have been compelled to do so or the jury would have been instructed that they might draw conclusions unfavorable to him from his suppression of the evidence. If a person indicted for a crime should persist in wearing a mask, it can scarcely be doubted that a Court would order the mask to be removed so that a witness of the crime might be able to identify him with the criminal. In the same case it seems to have been conceded that either party might have called as witnesses the sisters of Arthur Orton (whom the prosecution alleged the defendant to be) merely for the purpose of permitting the jury to see whether they resembled the defendant or not. The counsel for the defendant constantly called the attention of the jury to the color of his hair, &c., and two locks of hair were exhibited to the jury for their examination and comparison, one of which had been taken from the head of Sir Roger and the other from the head of the defendant.

We think it unnecessary to pursue the discussion any further.

Error. The plaintiff is entitled to a new trial.

.PER CURIAM.       *Venire de novo.*