JAMES C. LONG v. TERESA H. LONG.

*Divorce--Fraud in Contracting Marriage.*

1. It has always been and is now the policy in this State to regard marriage as indissoluble except for the causes named in the statute. (Bat. Rev. ch. 37, § 4.)

2. Where in an action for divorce brought by the husband, the jury found that the marriage, so far as the plaintiff was concerned, was procured by the fraud of the defendant in disclosing the fact of her then pregnancy, and that the plaintiff immediately upon the discovery of such fact separated himself from her ; *It was held,* that the plaintiff was not entitled to a divorce.

(RODMAN, J. *Dissenting.*)

*(Scroggins* v. *Scroggins,* 3 Dev. 535 ; *Barden* v. *Barden, Ibid,* 548, cited, commented on and approved.)

CIVIL ACTION for Divorce tried at Spring Term, 1877, of MECKLENBURG Superior Court, before *Cloud, J.*

The plaintiff alleged that he was married to the defendant on the 22d of January, 1874 ; on the 8th of March following, he discovered that she was pregnant and had been so for more than four months; on the 29th of July following, she was delivered of a child; on discovering her condition in March as aforesaid, he separated from the defendant ; that the defendant practiced a fraud on him in contracting the marriage, he supposing her to be a virtuous woman ; and that at the time of the marriage she was more than two months gone in pregnancy, and the plaintiff was informed thereof by the defendant's own confession. Wherefore the plaintiff demanded judgment that the marriage contract be declared null and void. The defendant filed no answer, and the jury found the facts in accordance with the allegations in the complaint. The plaintiff then moved for judgment which was refused by His Honor and the plaintiff appealed.

*Messrs. Shipp & Bailey,* for plaintiff.
No counsel for defendant.

READE J.   There are but three causes assigned for divorce by our statutes:

1. "If either party shall separate from the other and live in adultery.

2. " If the wife shall commit adultery.

3. "If either party at the time of the marriage was and still is naturally impotent."

This is the declaration of the legislative will as late as 1871.   The Legislature has not only restricted the *causes* for divorce, but it has also been careful as to the *manner of ascertaining* the causes.   The declarations or admissions of the parties in Court or out of Court go for nothing.   Every allegation is to be deemed as denied, whether it is denied or not, and nothing is to be allowed except what is found by the jury.   Bat. Rev. ch. 37, § 7.

There are with us no such things as " divorces made easy," " divorces without publicity," and the like, as are said to prevail elsewhere ; but our policy always has been and is now, to regard marriage as indissoluble, except for such grave causes as are named above, and to hedge in the trial with such precautions as prevent collusion, surprise, or imposition.

If the findings of the jury are to govern, we must see what those findings were :

1. " Were the parties married on the 22nd of January, 1874 ?—Yes.

2. " Was the marriage, so far as the plaintiff was concerned, procured by the fraud of the defendant ?—Yes.

3. " Did the plaintiff separate himself from defendant immediately on discovering the fraud ?—Yes."

No one will pretend that there is anything whatever in the verdict to authorize a divorce under our statute.   The

marriage was procured by fraud ; what fraud ?—did she represent herself to be rich when she was poor ?—had she false teeth ?—did she paint ?—or, what else ?

As a divorce cannot be granted upon such a verdict, it is not necessary and scarcely proper to look to the complaint to see what the verdict relates. We find that the fraud complained of was, that the defendant was more than two months gone with child at the time of marriage, which fact she did not disclose. That fact may have been true and yet no fraud, for she may not have known it herself at that early stage. And if she knew, as she must have known, that the fact *might be so;* yet she may have known also, that he knew as much about it as she did, for he does not deny that he was the father of it. It is true that he says he did not know that she was pregnant until she confessed it some two months after marriage ; yet that is quite consistent with his being the father of it, especially as she did not say that anybody else was, and still more especially, as he does not say that anybody else was, and does not deny that he was.

It is also true that he says that immediately on discovering her condition he sent her away and has not cohabited with her since; yet that is consistent with his fear that the birth of his own child, earlier than the laws of nature would allow within marriage, would disgrace him for having gotten it before.

It is also true that he says she held herself out to be virtuous, and he thought her to be so at the time of the marriage; yet that may be quite consistent with the fact that he *knew* her to be so, in regard to all others except himself, because he himself had seduced her and no one else had, and that he was enabled to do so only by a promise of marriage.

Now all this may be hard measure to the plaintiff, but he has courted it by seeking the dissolution of marriage with one who he says was an "orphan girl" and whom he or some one else ruined, and to turn her and her child, wrecks upon the

world without the courage on his part to deny in express terms that he is the author of their ruin, and without daring to charge any other fault than that she did not disclose the fact that she was pregnant.

The fact that the complaint and the issues present a case so suspicious and so insufficient, can find no excuse in the unskillfulness of counsel, for they are able and experienced, and it is our duty to assume that the fault is with the plaintiff. But consider the case in the best light for the plaintiff;—he was a worthy man, married as he supposed a chaste woman, and found that he was deceived and had an impure woman with child by another. Is that a cause for divorce under our law? As long ago as 1832, in *Scroggins* v. *Scroggins*, 3 Dev. 535, it was decided that it is not. Indeed that was a stronger case than this. There the wife was pregnant at the time of the marriage and was subsequently delivered of "a mulatto child," whereas both she and her husband were white. So that it was certain that the husband was not the father, and it was equally certain that a negro was. The case was elaborately argued on both sides, and an elaborate opinion delivered by Judge RUFFIN, the Court being then composed of those great names—HENDERSON, RUFFIN and DANIEL—and it was decided that a divorce could not be granted. In delivering the opinion Judge RUFFIN said ; "The case now before us rests upon a matter existing at the time of the marriage. And it must be admitted to be as strong a case as can well be if the petitioner acted properly * * * . The petitioner puts the case upon the ground of fraud * * * . But the fraud here consists of the other party not having the qualities and character he supposed her to have. It would be dangerous to lay down a rule of that sort. It is impossible to say where it would stop. * * * Concealment is not a fraud in such case. Disclosure is not looked for * * * . I know not how far the principle contended for would extend. If it embrace

a case of pregnancy, it will next claim that of incontinence ; it will be said that the husband was well acquainted with the female and never suspected her and has been deceived  *  *  *  . From uncleanness it may descend to the minor faults of temper  *  *  *  . There is in general no safe rule but this ;—That persons who marry agree to take each other *as they are*  *  *  * . After the law has been settled upon this subject for ages, and when the Legislature has been unable to devise any alteration founded on a general principle worthy of their adoption, it would be too much to expect a Court to pretend to have more wisdom than the Legislature and our forefathers united, and strike out new theories. And we cannot but say, that nothing could be more dangerous than to allow those who have agreed to take each other in terms *for better, for worse,* to be permitted to say that one of the parties is worse than expected." And the Judge concludes by calling the attention of the Legislature to the matter, in order that if the Court had erred, there might be such legislation as would prevent future error. And yet although that has been nearly half a century, there has been no legislation enlarging the powers of the Court, but in 1871, they were actually restricted ; for the Act of 1827, under which *Scroggins* v. *Scroggins* was decided did, after specifying impotency and adultery as causes for divorce, authorize the Court to grant divorces when the "Court should be satisfied of the justice of the application," which the Court in that case thought might enlarge the powers of the Court, but in the present statute of 1871, there is no such provision. And therefore we suppose that the Court is restricted to the causes specified—impotency and adultery.

It is true that there have been always other grounds for declaring marriages void, but they do not fall properly under the head of divorce. They are such as idiocy, pre-contract, &c., in which cases there was no marriage at all. It was obsolutely void for want of power to contract.

It is also true that in some of our sister States, the Courts have undertaken to grant divorces in cases where there was fraud in procuring the marriage contract. That has been done in the very respectable Courts of Massachusetts, New York and California. But it is said that they have done so under statutes expressly authorizing it. And in New Jersey it has been done where there is no statute to authorize it so far as we are informed, but it is put upon the broad ground of the power of a Court of Equity, to relieve against fraud. *Curriss* v. *Carriss*, 24 N. J. 517. But it was by a divided Court. So that we have to choose whether we will stand by our own decision and our own legislation until our own Legislature shall declare a different policy, or whether we shall forsake the old landmarks and go abroad after novelties.

At the same term when *Scroggins* v. *Scroggins* was decided, there was another case before the Court, where a man had married a woman who had lately had a child which she induced him to believe was his, but which he found to be a mulatto and of course not his. The Court below had dis_ missed the case and the Supreme Court sent the case back to be tried, and in doing so Judge RUFFIN seems to have been somewhat in conflict with what he said in *Scroggins* v. *Scroggins*. We do not know what became of the case. It is *Barden* v. *Barden*, 3 Dev. 548.

RODMAN, J: *Dissenting.* The case is this · The plaintiff on the 22d of January, 1874, married the defendant having reason to believe from the society in which she moved, and actually believing at the time of marriage, that she was a chaste and virtuous woman. Shortly after the marriage he discovered that she was pregnant, and immediately thereupon ceased to cohabit with her. In ·some months thereafter she was delivered of a child. from the date of whose birth it appeared that at the time of the marriage, she was between two and three months gone with child. The plain-

tiff asks to have the marriage declared null on the ground of fraud.

I say that at the time of the marriage the plaintiff believed the defendant to be chaste and virtuous, because he swears in his complaint that he believed her to be virtuous, and chastity is included in that word when applied to a woman. It is universally admitted that although marriage is a political and social institution, and creates a certain status of the parties, yet it is begun by a contract which like all other contracts may be avoided for fraud. It is, however, a contract of such an important and peculiar character, that many frauds and misrepresentations which would avoid other contracts, will not avoid this. There is a diversity of opinion as to the nature of the fraud which will avoid it. If either of the parties be incapable of contracting altogether from imbecility of mind, or from duress, or from entering into that particular contract by reason of a previous existing marriage, or be incurably impotent, it is agreed that the marriage may be avoided. It seems also to be agreed that mere want of chastity on the part of the woman before marriage, although she has concealed the fact from her husband, and no false representations of station or fortune, will suffice. To have the effect of avoiding the marriage, the false and fraudulent representations must touch some matter essential to the contract. So much seems to be agreed on by all the authorities. There are differences of opinion as to whether the concealment by the woman of the fact that she was then pregnant by another man, is such a misrepresentation in essentials as will justify a Court in annulling the marriage. The suppression of such a fact, which must necessarily be known to the woman, must be regarded as a misrepresentation, especially where the husband is innocent of any intercourse with her before the marriage. No affirmation of chastity in words is possible under such circumstances. If the woman knows that the man courts her

in the belief of her purity, to receive his addresses is to affirm that she is pure, as positively as the usages of decent society permit.

One object of marriage undoubtedly is the pleasure of association with a female. But the paramount object is the procreation of offspring from the bodies of the twain whom marriage makes one flesh for the perpetuation of the species, and especially for the continuation of the blood of the man and of his chosen bride, unadulterated by the blood of strangers to their union. Politics, which is reason considering man as a temporary inhabitant of this earth, and Religion, which is reason considering him as an heir of immortality, and the Instinct which, because the Creator has implanted it in his creature, we call the law of God, all combine to consecrate marriage for this purpose. Unless we hold that in the contract of marriage, each party does by the strongest implication represent that he is then competent for that purpose, and that such representation is in respect to something essential to the contract, we degrade the marriage of men to the level of the transient loves of beasts.

It is obvious that if a bride be at the time of marriage pregnant by a stranger, she is incompetent, at least for the time being, to fulfill her part of the contract in that sense which is its holiest and purest interpretation, as well as that in which by the common sense of mankind it is generally understood. She brings into the family an unexpected guest, a child who by presumption of law is the child of her husband, although they both know it not to be, and who if the marriage subsists must be regarded as such, entitled from their presumed father to equal care with the after born, and to inherit equally with them in his property.

An eminent writer on this subject (Bishop, Mar. & Div.) in criticising the opinion of the Supreme Court of Massachusetts in *Reynolds* v. *Reynolds*, 3 Allen 605, although he concurs in the judgment, thinks that the Court gave too

much weight to the argument that the illegitimate would inherit; because he thinks the illegitimacy might be proved upon a contest respecting the inheritance, as well as in an action to annul the marriage. Perhaps that might be so where the proof made legitimacy impossible, as where the mother and husband were white and the child was a mulatto, as in the recent case of *Warlick* v. *White*, 76 N. C. 175. But in such a case a strong presumption would be made in favor of the legitimacy of the child which in general it would be impossible to overcome. Besides, the evil of disputed inheritance is almost as great as that of a false one. I cannot but think that such a fraud goes to the essence of the contract and that on every principle of justice and good morals and public policy, it should be declared null. The parties should not be forced into a life long co-habitation, begun in fraud on one side and mistake on the other, where the mutual love and respect, which heighten good and alleviate bad fortune among parties to more fortunate unions, do not exist, and from which nothing but life long strife and misery can result. I am assured of the correctness of this opinion when I find it sustained by such eminently able and respectable Courts as those of Massachusetts, in *Reynolds* v. *Reynolds*, 3 Allen, 605; of California in *Baker* v. *Baker*, 13 Cal. 87-102; and of New Jersey in *Carriss* v. *Carriss*, 24 N. J. Eq. 516; and of several other States, whose decisions were cited to us by Mr. Bailey.

In Virginia and Maryland, cases of antenuptial incontinence are provided for by statute, and it is declared a ground for annulling the marriage. But the judgment of this Court in this case, especially as interpreted by the only authority on which it relies (*Scroggins* v. *Scroggins*, 3 Dev. 535,) has a sweep wider than it might be seen to have at the first glance. It does not appear in this case what was the color of the child which begotten before marriage made its unwelcome appearance in the house of the plaintiff. I assume as I am

informed is the fact, that it is white. Certainly this will mitigate the fault of the woman, and it is probable as is usual in such cases that she was more sinned against than sinning, and in fact was guilty in nothing but in deceiving the man whom she married. But the opinion of the Court does not rest in any part upon the color of the child. Its reasoning covers just as well a case where the child was black. Such a difference would be too trivial to furnish a distinction between two cases coming in other respects within the doctrine of the decision. And in the case upon which it rests, and which so far as I know is the only case to that effect ever decided, the child with which the woman was pregnant at the marriage was black. It will not be unfair therefore to assume for the purpose *merely* of discussing the principle of the present case (although the fact I believe is otherwise) that the child was black. The case of *Scroggins* decided in December, 1831, was this: The plaintiff (presumably a white man) married the defendant (presumably a white woman) on the 18th of December, 1828. On the 1st of May, 1829, (about four and a half months after the marriage) she was delivered of a mulatto child. He prayed for a divorce and the Court refused it.

As I propose to discuss freely the opinion in this case, I take occasion to say in advance that it was decided in a notably brilliant period of our judicial history. The bench of this Court was then filled by RUFFIN, HENDERSON and DANIEL, each of whom was gifted with an intellect of unusual native vigor, which had been liberalized and expanded by a study of history and philosophy to a degree not very common among the profession even in this day of the diffusion of knowledge, and each of whom had the habit of independent thought, as is shown by the numerous separate and dissenting opinions found in that and the succeeding volume of our Reports. Notwithstanding this they were not above error, and judging at this day with the advantage of lights

which they did not have, I think with all respect for them and for those who follow them at this day, that they did greatly err in that decision. The question was then entirely novel. The Judges complain that it is. It had never before been discussed in a philosophical, or legal, or in any but an ecclesiastical light. The able discussions in the cases in the other States which I have cited, are all of a later date. The learned counsel for the defendant contended that the question was governed by the ecclesiastical law. A few lines early in the opinion of RUFFIN, J., give the key-note of the decision; -"There is no member of the Court who is not strongly impressed with the conviction that divorces ought in no cases be allowed, but in that already mentioned (impotence) and near consanguinity." The decision is, therefore, upon the ecclesiastical and not upon the common law. It could not indeed escape the clear mind of RUFFIN, that the principles of the common law were competent without aid from any ecclesiastical canons to solve every question arising out of fraud in the making of a contract. But he failed to grasp boldly the conception which afterwards produced such admirable fruit in the minds of the Judges of Massachusetts and elsewhere He says; "The petitioner puts the case on the ground of fraud. * * * But the fraud here consists in the other party not having the qualities and character he supposed her to have. It would be dangerous to lay down a rule of that sort," &c. He failed to see that there was a broad distinction between fraud and misrepresentation in matters which the law considers not of the essence of the contract, such as temper, fortune, &c., and those which are.

Upon what ground of reason does the right to a divorce for impotence stand, except that the false representation respecting it which is implied by entering into the contract of marriage, is a fraud which goes to the essence of the contract? The defect in the case before him came within the same principle, but he allowed impotence to be a good

ground because the ecclsiastics had said so; but not the defect in question, because they had never had occasion to say so, and of course had not said so. I have I hope sufficiently indicated the error in the opinion to make it plain to any one. Evidently the learned Judge had no confidence in the conclusions which he drew from his slight attempt to apply the common law to the case; for immediately afterwards, he assumes without any other ground than that the petitioner had not expressly denied any intercourse with the defendant before their marriage, which was nowhere charged against him that such intercouse had existed, and makes an argument adverse to the petitioner on that assumption. That argument would have been entirely unnecessary if the previous one had been thought to be sufficient. That ground for refusing the divorce does not apply to this case, because here a previous illicit intercourse is denied.

Whatever weight the opinion in *Scroggins'* case might have had by itself, is at least greatly impaired by the decision in *Barden* v. *Barden,* immediately following in the volume, but probably decided some weeks at least after the case of *Scroggins.* That case was this: The plaintiff married the defendant, knowing that she had had a child then living, which however he believed to be his. After a while he discovered that the child was a mulatto, and thereupon he separated from the defendant and applied for a divorce. The decision was that if the plaintiff was induced by the representations of the defendant to think that the child was white and was his, he was entitled to a divorce. RUFFIN J. again delivers the opinion, and he says it is the opinion of his brethren in which he does not refuse to acquiesce. I infer from this that the other Judges had merely acquiesced in his opinion in *Scroggins'* case. He says further that the decision is a concession to the "virtuous prejudices" of the people, from which I infer that the Court had heard that the common sense of the people rejected the former opinion,

and like sensible men they admitted the supremacy of common sense and abandoned the opinion.

It is said that hard cases are apt to make bad law. If by a hard case one is meant in which the application of some technical rule of law, or an adherence to some obsolete precedent produces a decision manifestly opposed to justice and common sense, I think it may more properly be said that it is the bad law which makes the hard case. The positive language of a statute may perhaps sometime compel a Judge to decide contrary to justice. But it is impossible that the common law, whose foundation is reason, can in any case be opposed to justice, good morals, or public policy. Can a harder case than that of *Scroggins* (leaving out his supposed antenuptial incontinency) be conceived of? It cannot be heightened by any effort of the imagination. A mulatto has a right to sit at his board and innocently claims his paternal caresses. If, unfortunately, he has children born to him, they are not pure of his race. The blood of the woman, as physiologists tell us, has been tainted by mingling with that of her first child, and she is incapable of bearing children that will not show some mixture of African blood in appearance or character. It is well known that a mare which has once borne a mule, is incapable ever after of bearing a pure blooded horse. The man has lost the common right lawfully to continue his pure race. The same law, which as interpreted by the Courts compels co-habitation with the woman and association around his hearth by himself and his children with her mulatto child, says, that the mulatto and his white brothers shall not attend the same school. And a law not written, but which no canon of an ecclesiastical council, nor any Civil Rights' Act of Congress, nor any decision of a Court can control, says, they shall not associate in the same social circle.

I cannot conceive how any one can think that such a fraud does not touch the essentials of the marriage contract. I

cannot believe that the common law, whose boast it is to furnish a remedy for every wrong, has no remedy for a wrong such as this.

'I think the marriage should be declared null.

PER CURIAM.                    Judgment affirmed.