STATE OF IOWA v. C. A. NATHOO, Appellant.

**Criminal law:** CARNAL KNOWLEDGE OF FEMALE: EVIDENCE. Mere proof
1 of opportunity or suspicion of- guilt are not sufficient to warrant a conviction for, assault on an insensible female with intent to have carnal knowledge of her.

**Same:** EVIDENCE: HEARSAY: SELF-SERVING DECLARATIONS. Hearsay
2 and self-serving declarations are not admissible against a defendant charged with carnal knowledge of a female while in an insensible condition; as her statement to a physician while examining her in defendant's presence, and in response solely to the physician's inquiry, that there had been no other man with her. Nor would such evidence tend to prove the truth of the statement.

**Same:** EVIDENCE: RACIAL CHARACTERISTICS: INSTRUCTION. On a prose-
3 cution for having carnal knowledge with an insensible female, and there was evidence concerning the racial characteristics of a child born to prosecutrix but no evidence tending to show the race to which defendant belonged, the jury should have been instructed not to consider any alleged resemblance between the child and defendant, for any purpose in the case. Whether the circumstance that it might have been of mixed blood modified the rule, *quaere.*

**Same.** Even though it appeared that prosecutrix and defendant were
4 of different races the exhibition of a child born to prosecutrix was not permissible to establish resemblance; especially where there was no .evidence that it might not have been begotten by another of like race as defendant.

**Examination of witnesses:** RESPONSIVE ANSWERS. In the examina-
5 tion of witnesses a party is entitled to answers responsive to the inquiry, and such portions as are not may be stricken on motion.

**Same:** ASSAULT WITH INTENT TO COMMIT RAPE: INSTRUCTION. An
6 instruction defining assault with intent to commit rape as· an assault upon a female with intent to have intercourse with such female, which omits the element of force, is erroneous.

**New trial:** MISCONDUCT IN ARGUMENT. An attorney should not base
7 an argument for conviction on the court's order overruling a motion for a verdict for defendant on the ground of insufficient

evidence: Nor should he attempt in his opening statement to get before the jury matters which he must know he will not be allowed to prove: Nor should he assert as true in his closing argument a material fact utterly without support in the evidence. And where an attorney is guilty of misstating the facts the court should direct that it be not repeated; it being insufficient to simply refer the question of whether the evidence supported the statement to the jury.

*Appeal from Polk District Court.—*Hon. LAWRENCE DE GRAFF, Judge.

TUESDAY, NOVEMBER 14, 1911.

THE defendant was accused of having carnal knowledge of an insensible female, and convicted of having assaulted such female with intent to have carnal knowledge of her. He appeals.—*Reversed and remanded.*

*A. D. Pugh* and *J. M. Parsons,* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

LADD, J.—I. The accused is alleged to have produced "such stupor of mind and weakness of body" of Margaret Miller as to prevent effectual resistance by "the use of means to the grand jury" unknown, and thereupon to have carnally known and abused her. In order to prove this charge, the state relied entirely on circumstantial evidence. No one testified that defendant had had intercourse with Margaret, nor was there testimony that she had not indulged in intercourse with another. Someone must have been unduly intimate with her, for she was delivered of a child May 11, 1910. Though the record is silent as to whether defendant was a physician and authorized to practice as such, it appears that in May or June, 1909, he was called upon by Mrs. Miller to treat her daughter, then fifteen

years old past, and visited her once or twice before giving physical treatments. The first of these was administered in the evening of July 3d in the parlor of Mrs. Miller's house. This was a front room with bay window, and was connected with the room back by an arched doorway hung with portieres. Margaret was lying on the lounge, and, after talking for a few minutes, defendant caused the curtains over the windows to be drawn down, the portieres drawn together, and requested Mrs. Miller to leave the room, take the light with her, and bring hot water and cloths, explaining that "he didn't want Margaret's mind on anybody but himself, as it would interfere with the treatment." She brought the water and cloths, and, after withdrawing, he directed Margaret to remove all her clothes, and while she stood he massaged her entire person, and, after this was done, had her lie on the floor with head on the end of the lounge when he administered the douche (being between her legs when doing so). This eased her, and she became drowsy and fell asleep, but would waken upon being spoken to by him. This treatment seems to have been repeated several times, but always in the parlor, save that on one occasion it was begun in a bedroom, and, on interruption, completed in the parlor. At no time were he and Margaret alone in the house. On two occasions he inserted, or at least pretended to insert, a rubber tube, said by Margaret to have caused pain. The treatments usually were begun at dusk, and completed at about midnight. Subsequently defendant suggested a room on the second floor where his treatments would be uninterrupted, but, as this was not provided, he did not call again until the following May. It is to be inferred from the evidence that, though furnishng medicine, he relied largely on electric and psychic influences to aid in effecting a cure. On May 8, 1910, Dr. Sanders examined Margaret, and found her to be pregnant. Mrs. Miller immediately informed defendant, when he accused her of wanting to blackmail him,

but promised to call to see her daughter. He did so, accompanied by Dr. McCartney, and, on seeing Margaret, said to her that there was nothing the matter except a large blood clot, which would pass away most any time, and, then taking her by the right hand, said, "I swear to God I am innocent," and added, "Anything money can do for you, you shall have."

Such was the evidence on which the state relied for conviction of the offense defined in section 4758 of the Code. "If any person unlawfully have carnal knowledge of any female by administering to her any substance, or by any other means producing such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, or have such carnal knowledge of an idiot or female naturally of such imbecility of mind or weakness of body as to prevent effectual resistance, he shall be punished as provided in the section relating to ravishment." There was no evidence tending to prove Margaret to have been naturally of such imbecility of mind or weakness of body as to prevent effectual resistance, nor was there any showing that the accused administered to her any substance producing stupor, imbecility of mind, or weakness of body. If this effect was produced, other means must have been resorted to. What could these have been? Massage of the body may have excited the passions, and in that manner have obviated resistance, but not in the way contemplated by this statute, by producing stupor or imbecility of mind or weakness of body. In that way, and by the administration of the douche, she was eased and fell asleep. Was this a natural sleep, or was it the result of hypnotic or other influence exerted on the girl? The record throws no light on this inquiry. For all that appeared on the trial, she fell to sleep naturally, and as a consequence of the treatments begun at her mother's solicitation, and continued with the acquiescence of herself and

1. CRIMINAL LAW: carnal knowledge of female: evidence.

daughter. The most that can be said is that there was
opportunity for the accused to have had intercourse with
Margaret when asleep. It is universally held, however,
that opportunity alone is not enough to justify the con-
viction of an offense like that charged, and, even if it
were, the situation was at the solicitation and with the
acquiescence of Margaret and her mother, rather than
through "other means" exerted by defendant. For all
that appears in this record, he may have been a physician
and entitled to administer treatment thought suitable to
the condition of the patient; have acted in entire good
faith, and the child have been begotten by another. No
one testified that he was its parent, nor did prosecutrix
deny that it was begotten by another. Something more
than a suspicion ought to be established by the evidence
in order to justify conviction of a crime. The evidence
was insufficient to sustain the verdict.

II. Dr. McCartney testified that Margaret told de-
fendant that Dr. Sanders had said she was either pregnant
or had a tumor. "Q. What did Nathoo say to that? A.
He said, 'That can not be.' Q. What, if
anything, did Margaret say at that time in
regard to other men? (Objected as incom-
petent, a self-serving declaration.) Court:
You may state what was said there by Margaret to the
defendant. A. I believe she said there had been no other
—the expression she said there had been no other man
with her." A motion to strike the answer was overruled.
Subsequently Dr. McCartney testified: "I believe I asked
Margaret if there had been any man there, if there was a
possibility of it, if there had been anyone with her, and it
was in response to my question she said no other man had
been with her. (Defendant moves to strike out the evi-
dence of this witness as to the statements of Margaret Mil-
ler as not voluntary, and as inadmissible as a complaint,
and on all the grounds urged in the objections heretofore

2. SAME: evi-
dence: hear-
say: self-
serving de-
clarations.

in the record.)    Court:    The complaint has nothing to
do with this.    The motion is overruled.    (Excepted to.)
Court:    This was in the presence of the defendant?    A.
Yes, sir."    The motion should have been sustained.    The
statement, if made, was not such as to exact any response
from the defendant, for he could not be expected to know
whether anyone else had been with Margaret.    His silence
then tended in no manner to implicate him, and the testi-
mony was hearsay and self-serving, and should have been
excluded.

Had the evidence been admissible, however, it did not
tend to prove the purported statement to be true, and the
court erred in refusing to give the third instruction re-
quested so stating.    The ruling was prejudicial, in that it
introduced a very material statement before the jury of
which there was no proof.

III.    Dr. Morse, after testifying in direct examination
that the baby was of brown complexion with black, luster-
less hair, said, on cross-examination, that it belonged to the
Aryan or Indo-European race.    On redirect
examination, he explained that the white
race was divided into the Caucasian, brown,
and sunburned races, and that the color de-
pended upon the amount of pigment in the skin, and that
"this child was pigmented," and had none of the charac-
teristics of the negro baby.    The defendant thereupon
asked that a note be made of the baby being brought into
court, and objected to its exhibition to the jury as incom-
petent for any purpose.    "Court:    The record may show
a baby is now tendered the witness.    Q. Doctor, I will ask
you whether or not this is the baby you saw?    (Defendant
objects to the interrogatory to the witness, and to the ex-
hibition of the baby to the jury on the ground that the
same is incompetent and immaterial.    Overruled.    Ex-
cepted to.)    A. Yes, sir."    The doctor then pointed out
the differences between the baby and a negro baby.    On

3. SAME: evi-
dence: ra-
cial charac-
teristics: in-
struction.

recross-examination the witness was asked: "The head and face of that baby is the head and face of a child that might belong to any of the European races, especially of those of Southern Europe, is it not a fact? A. Yes, sir." The witness then testified that there was nothing in the features of the baby not characteristic of the Caucasian race, and that he had seen babies born from light complexioned people who had approximately the amount of pigment that appeared in the baby he held, and declared that he could not tell whether the child was a descendant of an Italian, Greek, Jew, Syrian, or Spaniard, or some of the Caucasian races of Northern Africa. On redirect examination the witness was asked to point out the peculiarities of the child and, over objection, was permitted to do so, and said its hair and eyes might be those of the Hindoo race. On recross-examination, however, he testified that these might be those of a Greek or most any dark straight-haired people, and that many times purely white babies are born with very dark eyes, and that nothing in this one would cause him to pronounce it a Hindoo baby. No evidence tending to prove the race to which defendant belonged was adduced. With reference to such testimony, the court was requested by defendant to instruct the jury that they "must not consider any alleged resemblance between the said baby and defendant for any purpose in this case, but you may consider the appearance and characteristics of said baby as tending to establish the race to which it belongs, and, if you find that the alleged sexual intercourse between prosecutrix and defendant has been otherwise satisfactorily proved, you may consider the mere fact of said baby as corroborative of said intercourse, but you must not consider said baby as evidence otherwise than set forth in this instruction." No instruction of like purport was given to the jury, and, as it clearly and correctly stated the law with respect to alleged resemblance, there was error in not giving it or an instruction of like

import. *State v. Danforth,* 48 Iowa, 43; *State v. Harvey,* 112 Iowa, 416; *State v. Hunt,* 144 Iowa, 257; *State v. Stark,* 149 Iowa, 749; *State v. Meier,* 140 Iowa, 540.

Even had it been shown that the accused was of a race other than that of prosecutrix, profert of the child would not have been permissible to show resemblance.

4. SAME.      Whether it might have been viewed by the jury as tending to prove it to be of mixed blood is not before us for determination, for the requested instruction conceded as much. Certainly, decisions often cited as so holding do not go to that extent. In *Warlick v. White,* 76 N. C. 175, the issue was as to whether one Sarah was the child of Joseph Carpenter, deceased, and entitled to inherit his property, and, to disprove that, it was held that the court should have compelled her to take the witness stand for the inspection of the jury in aid of the contention that she was of mixed blood. In *Garvin v. State,* 52 Miss. 207, the indictment for larceny described defendant as a colored man, and it was held this must be proven and was in fact proven by profert of him in evidence. There is a manifest difference between proving that a person was not the daughter of a white man begotten of a white woman, or that a person is colored, and proving that a child was begotten by a designated colored person by showing it to be of mixed blood. This furnishes no proof that it may not have been begotten by some other colored person. Possibly by the process of elimination— that is, by showing nonaccess of all others of like color— such evidence might be rendered admissible. However, there was nothing in this record to raise the question, and, in view of this and the wording of the instruction requested, we ought not to pass thereon until raised and fully argued. Failure to instruct on this subject was especially prejudicial, as both in the opening statement and closing argument counsel for the state alluded to the alleged resemblance of the baby to the accused.

IV. Mrs. Miller was asked on cross-examination, "How many times altogether was Nathoo there?" and answered, "I did not keep track, because I trusted the man, and did not think it was necessary." The defendant moved to strike from this answer all after the word "because" as not responsive. The motion was overruled. This was error. The party asking a question is entitled to a responsive answer, and, if the answer or any portion of it is not responsive, may have it or such portion as is not responsive stricken on motion. *Christensen v. Thompson*, 123 Iowa, 717. The inquiry was for the fact, and not for her reasons for not being able to state it.

5. EXAMINATION OF WITNESSES: responsive answers.

V. In the eleventh instruction the court advised the jury concerning the included offenses, but in the twelfth instruction, after defining assault, proceeded to define assault with intent to commit rape by saying that "one who makes an assault upon a female with intent to have sexual intercourse with such female is guilty of an assault with intent to commit rape." This was erroneous in omitting the element of intent to have such intercourse by force and against the will of the person assaulted. As the included offense of assault with intent to commit the offense charged in the indictment was not defined, the jury may have inferred that this was intended as a definition thereof and have been misled thereby.

6. SAME: assault with intent to commit rape: instruction.

VI. Numerous objections were interposed to the conduct of the attorney for the state in the opening statement and closing argument to the jury, and we have to say that in the allusion to the alleged resemblance of prosecutrix's baby to defendant in the opening statement, the contention that, inasmuch as the court had overruled the motion to direct a verdict, there was sufficient evidence on which to base a verdict of guilty by the jury, and the statement that prosecutrix had

7. NEW TRIAL: misconduct in argument.

testified that no one else had had intercourse with her, transcended the domain of fair argument.

An attorney ought not to be permitted to get a matter before the jury in an opening statement which he must know he will not be allowed to prove under the specious pretext that it can not then be said what evidence will be received.

Nor should he base an argument for conviction on the court's order, overruling defendant's motion that a verdict of not guilty be directed because of insufficiency of the evidence. Such a ruling merely relegates the issues to the jury for determination, and it is still for them to say whether the evidence is such as to justify conviction. On objection being made, the court remarked that the matter "should be left upon the records." "Mr. Guthrie: Well, is not that a fact in the case? Court: I shall ask you not to discuss that fact; that is record concerning the court, and not the jury. Mr. Guthrie: I want to say both of them argued to the jury that there was no legal or sufficient evidence for this jury to base a verdict on, and I certainly have a right to reply to it. Mr. Pugh: We certainly did, but we did not refer to the motions or to the opinions of the court. Court: I will direct the jury at this time not to pay any attention to any matters so far as the rulings of the court are concerned, except the rulings on evidence." This was a ruling on the evidence, though doubtless not such an one as the court referred to in its remark, and it is doubtful whether what was said by his honor disabused the minds of the jury of the plausible but improper argument being advanced.

Possibly the instructions may have had this effect. A suggestion to the jury that the only effect of the court's ruling on the motion to direct a verdict was to hold the issue as to defendant's guilt was solely for the jury would have obviated any possible prejudice, and might well have been made. Nor ought an attorney in his closing argu-

ment to the jury to have asserted a matter of such importance as that prosecutrix had testified that she had not indulged in intercourse with another when the statement was utterly without foundation, and, upon objection being interposed, it is not enough to relegate the issue as to whether she so testified to the jury. The misstatement should have been corrected, and the attorney admonished not to repeat it.

Because of the errors pointed out, the judgment is *reversed* and the cause *remanded*.