STATE OF IOWA, appellee, v. EUGENE WESLEY POTTER, appellant.

No. 47971.

(Reported in 54 N.W.2d 516)

July 28, 1952.

Joseph Z. Marks and James Lawyer, both of Des Moines, for appellant.

Robert L. Larson, Attorney General, Earl R. Shostrom, Special Assistant Attorney General, and Clyde E. Herring, County Attorney, for appellee.

MULRONEY, C. J.—The defendant was indicted for the crime of assault with intent to rape Marilyn Frances Henry. He pleaded not guilty and served notice of alibi witnesses. He was found guilty as charged and sentenced to twenty years in the penitentiary. Marilyn identified the defendant as her assailant. The question on the sufficiency of the evidence is whether there was sufficient testimony to corroborate Marilyn's testimony in connecting defendant with the commission of the crime.

Seventeen-year-old Marilyn Frances Henry was returning home alone between 11 and 11:30 after an evening spent with a girl friend at a movie and at Reed's Ice Cream place. She lived at 418 Olinda Avenue and while walking near the Van Lundgren home at 505 Olinda she met a man who grabbed her, threw her to the ground and stifled her screams by removing his glove and putting his hand in her mouth. The man scratched the back of her throat and threatened to kill her if she would not be quiet. He forced her to get into his car and down on the floor of the front seat. Mr. and Mrs. Van Lundgren testified they were awakened by the screams and they looked out the window and saw a man and woman walking toward a car. They described the man as approximately the same height as the girl and Mr. Van Lundgren said the man had his hand over the girl's shoulder as they walked across the street to the car and he put the girl in the front seat of the car. He noticed the car was a two-tone color but he "couldn't see whether it was a Chevrolet or Pontiac or what it was." The man drove Marilyn to a

near-by park where he stopped the car and took a roll of adhesive tape· from the glove compartment ·and put strips over her eyes and then he fastened her hands up around her neck with strips of tape. The man then took off Marilyn's underclothes and forced her down on the front seat and tried to rape her. When she screamed again he struck her in the face and pulled her to the back seat, removed her skirt and tried for a long time to rape her. Marilyn resisted as much as she could and finally the man quit, put her clothes back on her, getting her skirt on wrong side out, and drove her part way out of the park. He stopped the car, took Marilyn to the rear of the car and instructed her to start walking and not to turn around when he removed the tape from her eyes. Marilyn testified she had earlier seen that the car bore a license number of 23 dash and four ·figures and as she walked away she tried to turn around and see the number for sure but she was too scared to turn far enough around and the car was soon out of sight around a curve.

Marilyn ran home, a distance of about four blocks, arriving there about ten minutes to twelve. She told her parents what had occurred. They called the police and their family doctor. Her mother testified the girl was crying and nervous but able to tell what had happened. The mother testified as to the blood on her stockings and underclothes, her skirt on wrong side out, and that she was bleeding and bruised in the area of her vagina. She said she cleaned the tape marks off of·Marilyn's face. Her father said there was blood in and around her mouth and he said the next day he went to the place where his daughter was first attacked and found in the street a leather glove which was Exhibit C in the case. The doctor who ·examined her that night said a pelvic examination revealed a bruise and dried blood and he was of the opinion her sexual organ had been penetrated.

Marilyn told the story to the two police officers who arrived about 12:20 that night. These officers testified that she gave them ·a description of her assailant saying "he was twenty-five to thirty years, about five-foot seven or eight, long straight hair, medium slim face, rather pinkish complexion, had on a black leather jacket, medium voice, slight, some accent, used a lot of profanity." The officers also testified she described the car to them as near as she could, saying it had a 23 dash license number

but she could not be sure what the rest of the license number was. She added there was a possibility, since the plate was dirty, that it could have been 28 but she felt sure the first two figures on the plate were 23. One officer testified Marilyn said it seemed to her like there was a "2" or "98" in the other figures. Both officers testified she said the car was two-tone color with tan or gray bottom and what she thought was a green top, probably a coach, and she thought it could be a 1947 or '48 car, possibly a Chevrolet or General Motors car. Marilyn told the same story to the officers who called at nine o'clock the next morning.

Defendant was arrested at the corner of Harding Road and Hickman in the city of Des Moines about 6:30 p.m. on December 19, 1950. The minutes of testimony attached to the indictment show circumstances attending defendant's arrest which carried the implication that he was preparing to commit another crime. The trial court sustained a motion to strike testimony of these circumstances to the extent that they showed defendant's attempt to lure a young girl into his car by the false story of his need of a baby-sitter. However, the trial court did admit testimony of the arresting officers to the effect that when they arrested him they asked him his name and where he lived and he replied his name was Jack Smith and he lived at 2506 Euclid Avenue in Des Moines. These officers testified the Euclid address is a beer tavern. They described the car which he was driving at the time of his arrest as a two-tone green 1947 Pontiac coach with license No. 23-5258, and in the glove compartment of the car they found a partially used roll of adhesive tape, some lubricating jelly and some rags. They also found a small black toy pistol lying on the front seat of the car. The officers talked with defendant about the November 2 attack on Marilyn and he denied any knowledge of the attack and said he did not know her. The next day Marilyn was called to the police station and she was shown defendant with four other people and she picked out defendant as the man who attempted to rape her on November 2. She also identified his automobile as the car her assailant was driving on November 2. Marilyn also identified defendant as a man she had seen earlier in the evening on November 2 when she and her girl friend sat in Reed's Ice Cream place. She said that he sat in a booth across the aisle and "eyed" her all of the time. A high school girl friend who was a part-time employee of Reed's

testified she saw defendant come into Reed's right after Marilyn and her girl friend arrived and that she served him.

Defendant denied being in Reed's and said he had never seen Marilyn until he saw her in the courtroom. His story was that on November 2, 1950, his wife was out of town; that he dined that night at the home of his wife's uncle in West Des Moines where he stayed until twenty minutes to nine or nine o'clock. He and his wife had rooms at the home of Mr. and Mrs. Taylor and defendant said he arrived home about ten o'clock. He remembered talking with Mr. and Mrs. Taylor when the ten o'clock news came on over the radio. He told them of what a nice dinner he had and picked up some shirts Mrs. Taylor had ironed for him and went upstairs to bed and did not leave his room until seven o'clock the next morning. His story was corroborated by his wife's uncle and aunt and by the Taylors who also said he could not have left his room without their hearing him. He testified he had previously been convicted of a felony.

▮ I. As previously stated, the question on the sufficiency of the evidence is whether there was any testimony to corroborate Marilyn's testimony in connecting defendant with the commission of the offense. The fact that the crime was committed could be established by Marilyn's testimony alone. State v. Lahmon, 231 Iowa 448, 1 N.W.2d 629, and cases cited. In the instant case the commission of the crime was clearly established but we must examine the testimony independent of that of the prosecuting witness to see if there is any testimony which tends to designate the defendant as the perpetrator of the attack. Section 782.4, Code of 1950 provides that the defendant charged with the crime of assault with intent to commit rape cannot be convicted upon the testimony of the person injured "unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense."

▮ II. The prosecuting witness identified defendant and his car and also identified defendant as a man she had seen in Reed's Ice Cream place a couple of hours before the attack. The State points to the evidence of the waitress at Reed's who testified she saw defendant in Reed's at the time Marilyn was there—corroborating Marilyn's testimony that he was there. Such testimony does not tend to connect defendant with the commission of the offense. Reed's is a public place, located far from the

scene of the crime. In State v. Egbert, 125 Iowa 443, 447, 101 N.W. 191, 192, a thirteen-year-old girl was assaulted while walking along the road to her farm home two and a half miles south of Melrose. The next day she identified Egbert as her attacker and other witnesses testified they saw Egbert walking along the highway ahead of the girl just prior to the attack and other witnesses saw him later coming into the town of Melrose from the south. We held: "* * * conceding that there was some evidence that defendant was seen preceding the prosecutrix, and subsequently entering the town from the south, we think that this was not sufficient to constitute the corroboration required by statute."

III. The State points to the evidence as to the car used in the attack and the evidence of other witnesses as to defendant's car and the picture thereof which the prosecuting witness identified as the picture of the car used by her attacker. But the prosecuting witness is the only witness who said the car owned by defendant was the same car as the car driven by her assailant. She and State's witness Lundgren said the car the attacker drove was two-toned in color, and defendant's car was two-toned but of course there are thousands of two-tone colored cars. She said her attacker's car bore a 23 or Clinton County number and defendant's car had a 23 license number, but there are thousands of cars bearing those figures as the first two numerals on the license plates. The State's entire contention of corroboration with respect to the car testimony is answered by pointing to the fact that the prosecuting witness is the only witness who identifies the defendant's car as the car she was forced to enter on the night of November 2. To say this corroborates her testimony identifying the defendant as her attacker on that night would be holding she may be corroborated by herself. In State v. Lehman, 230 Iowa 141, 296 N.W. 819, we held a concession that others saw the prosecuting witness enter the defendant's car would be insufficient because such testimony would not identify defendant as the driver of the car.

IV. Finally the State contends the finding of the partially used roll of adhesive tape in the glove compartment of defendant's car when he was arrested tends to connect defendant with the commission of the crime. Marilyn testified as to the use of adhesive tape by her attacker to bind her hands and seal

her eyes and she said the tape found in defendant's car when he was arrested was the "type" of tape her attacker used and, "it was that width. It was an inch wide." This spool of tape which has been certified here contains three widths of tape on the single spool, the widest one being one inch, and apparently portions of all strips have been removed from the spool.

· The finding of this tape in defendant's car is about the only evidence upon which an argument could be based that the prosecuting witness's evidence was corroborated by other testimony tending to connect the defendant with the commission of the crime. But we are of the opinion it is insufficient. The evidence is much like that relied upon in State v. Lehman, 230 Iowa 141, 145, 296 N.W. 819, 821, where twelve days after the rape the officers found two bobby pins in defendant's car. The prosecuting witness testified that on the day of the tragedy she wore bobby pins of the kind found in defendant's car. In holding this evidence insufficient the opinion states:

"A bobby pin is used by women to hold the hair in place. They are used regularly by many women. They are sold at almost every ten-cent store. There was no special mark on these bobby pins; they were just ordinary bobby pins. Appellant's wife testified she used the same kind of bobby pins and rode often in the car with her husband, the appellant. They were not found until 12 days after the offense was committed. They do not in any way tend to prove that the appellant was the driver of the car at the time the crime was committed."

In State v. Arthur, 129 Iowa 235, 239, 105 N.W. 422, 424, where defendant was arrested the day after a bank was "broken and entered", and charged with that offense, we held: "The fact that a revolver was found in defendant's possession when he was arrested would certainly not tend in any way to connect him with this particular crime."

More closely in point is State v. Kehr, 133 Iowa 35, 37, 110 N.W. 149, 150, where it was shown that a burglar had a revolver at the time of the crime and that the defendant arrested two months later and charged with the crime also had a revolver in his possession at the time of his arrest. We held: "The fact alone that the defendant had a revolver in his possession two

months afterward would not necessarily tend to connect him with the crime (State v. Arthur, 129 Iowa 235) and it was clearly not admissible as a part of the history of the case."

. The foregoing are the portions of the testimony which the State argues establish the statutory corroboration. We are of the opinion these portions of testimony do not constitute corroboration tending to establish the connection of the accused with the crime. As we said in State v. Lamberti, 200 Iowa 1241, 1244, 206 N.W. 128, 129: "The statute is imperative, and leaves us without any discretion in the matter. A conviction cannot be supported in a case of this kind upon the uncorroborated testimony of a prosecuting witness."

V. Our holding on this first assignment of error makes it unnecessary to examine others but we desire to comment on one assignment having to do with alleged misconduct of the assistant county attorney, Mr. Glanton, in his argument to the jury. Portions of his argument to the jury consisted of calling the defendant "this ex-convict" and statements outside of the record. Parts of it consisted of an unwarranted attack on defense counsel. Counsel in effect argued there was sufficient corroboration to connect defendant with the crime for otherwise the court would have directed the verdict for the defendant. Sometimes the court sustained objections made by defense counsel but we doubt whether the court's remarks in his rulings were sufficient to impress on the jury that the arguments advanced were improper and should not be considered. We do not say we would have reversed on this assignment if the corroborative evidence tending to attach defendant to the crime had been sufficient. But we do call counsel's attention to cases where we have held arguments such as here made are improper, such as State v. Saltzman, 241 Iowa 1373, 44 N.W.2d 24, and State v. Nathoo, 152 Iowa 665, 133 N.W. 129. Counsel could read with profit the statements in State v. Hild, 240 Iowa 1119, 39 N.W.2d 139, and State v. Berry, 241 Iowa 211, 40 N.W.2d 480, on the duty of prosecutors to abide by the rules and proprieties of court procedure.

The judgment appealed from is reversed.—Reversed.

All JUSTICES concur.