STATE OF IOWA, Appellee, v. ROY J. HILD, Appellant.

No. 47256.

(Reported in 39 N. W. 2d 139)

1120

SEPTEMBER 20, 1949.

C. B. Hextell, of Des Moines, and Doran, Doran & Doran and N. A. Erbe, of Boone, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Ed S. Thayer, County Attorney, for appellee.

BLISS, J.—The indictment was signed by Carroll O. Switzer, County Attorney of Polk County. The assistant Polk County Attorney, Ed S. Thayer, and Paul E. Hellwege, County Attorney of Boone County, conducted the trial for the State.

It is not contended by the State that the defendant was the principal actor in the crime charged in the indictment, nor that he obtained Polk County warrant No. A-49864 for $703.07 from

the county auditor, nor that it was payable to him, cashed by him or that he ever received any part of its proceeds. It is the contention of the State that defendant participated in the crime by aiding and abetting one Elmer G. Croft to obtain said warrant and the proceeds thereof by false pretenses. As required by section 688.1, Code of 1946, defendant was indicted and tried as a principal.

Croft was a dealer in automobiles and repairs and rendered motor service in general at his place of business at 701 Cherry Street in Des Moines, which he operated under the trade name of "Modern Motor Service." He had previously operated the same kind of business at other locations in Des Moines where he bought and sold new and secondhand cars and serviced and repaired cars. For many years he had serviced the motor vehicles of the Polk County sheriff (ten or fifteen motor vehicles); of the State Bureau of Criminal Investigation (more than eighteen cars); of the Polk County Home; the Polk County Relief cars, and the cars of other county officers and of private persons. During the years 1944, 1945, 1946 and for several years just preceding, Croft had serviced, repaired, painted, supplied parts and did whatever was needed to keep in operating condition five Chevrolet sedans, one coupé and a panel truck belonging to the Polk County Welfare Board, two or three passenger cars, two trucks and a fire truck at the County Home, and eight or more cars for the county sheriff. The cars of the Welfare Board had been bought new by funds of the Des Moines Community Chest and given to the Welfare Board in January or February 1942. These seven cars used by the Board were housed at the place of business of Croft when not in use, and, under an arrangement with the Board of Supervisors or its Welfare committee, Croft was paid $100 each month for the storage, washing, greasing and incidental minor servicing of these cars.

Croft had been convicted in the District Court of Polk County of a felony—the theft of an automobile—on November 10, 1933, and shortly thereafter was sentenced to imprisonment for the statutory period in the penitentiary at Fort Madison. After serving less than a year he was paroled in 1934. He returned to Des Moines, and in January 1935 he began the opera-

tion of a service garage on the premises of the county jail. In January 1940, he moved his place of business to 701 Cherry Street. He was a good motor vehicle mechanic and through the years he gained the respect and confidence of his patrons. The care of the official vehicles was left largely to his own discretion and judgment.

On December 31, 1946, a Polk County Grand Jury jointly indicted Croft, William H. Cotton and H. H. Thompson, for obtaining money from Polk County, by means of false pretenses, through claim No. 1756. (Exhibit 53 in the case at bar.) The same grand jury jointly indicted Croft and Charles E. Parmenter for obtaining money by false pretenses from Polk County through claim No. 1893 (Exhibit 51 in the case before us). Croft was tried in January and February 1947 on the indictment first noted, and convicted, and on February 18, 1947, it was adjudged that he be imprisoned in the penitentiary at Fort Madison for seven years and pay a fine of $500. The judgment was affirmed by this court on July 29, 1947. State v. Croft, Iowa, 28 N. W. 2d 330. Early in 1947 Thompson, Parmenter and Cotton were each separately tried. The first named was acquitted. The second was convicted and judgment affirmed. State v. Parmenter, Iowa, 29 N. W. 2d 172. The third was convicted and judgment reversed. State v. Cotton, 240 Iowa 609, 33 N. W. 2d 880.

Promptly upon Croft's incarceration in the penitentiary under his sentence on February 18, 1947, he was interviewed there by Sheriff Reppert of Polk County and its County Attorney, Carroll O. Switzer. After serving thirty-six hours of his sentence, Croft, under order of the Polk County District Court, was returned to Des Moines for imprisonment in the Polk County jail, so that he might be more available for consultation with the prosecuting attorneys, and use as a witness for the State. At the time of the trial of defendant's case, Croft had been on his release from the penitentiary for about nine months, although all facts must have been thoroughly detailed to the prosecuting officers during the preceding trials.

Defendant was sixty-nine years old at the time of the trial. He and his wife have lived in Des Moines for many years. They have four living children. He was born and reared in Tama

County, Iowa, where he received his grade and high school education. He attended the University of Iowa and Highland Park College in Des Moines and obtained a degree in pharmacy. For a few years he and his brothers operated drug stores in Tama County. He then came to Des Moines where he and others operated three drug stores for some time. Later he and others organized the Union Realty Company which business was continued for twenty years. In 1932, he became a salesman for a large cement company and was so engaged for ten years and later was district sales manager of the Penn-Dixie Company. He then bought a 140-acre farm about eight miles north of Des Moines for about $9000, which he lived on and operated until it was acquired by the United States Government during World War II as a testing station. He received about $23,000 for it.

He moved back to his old home on East Fourteenth Street in Des Moines and became a resident of the second Supervisor District which is located in Des Moines, east of the Des Moines River. Polk County is divided into five Supervisor Districts. The first district is west of the river in Des Moines and Districts 3, 4 and 5 are in the country outside of Des Moines. The supervisors are not elected at large, but by districts. The defendant was a candidate at the general election in 1942 for supervisor in the second district and was elected, but, under the election statutes, he did not qualify and take office until the second of January, 1944.

While the duties and responsibilities of each supervisor are coextensive with the county, certain parts of the work and departments were assigned to designated members for individual attention and divided among eleven committees. When the Board of Supervisors met and organized on January 3, 1944, the members, other than the defendant, were William H. Cotton, from the first district, and B. B. Dewey, A. C. Hitz and Charles Elson from the country districts. At the organization meeting in January 1944, Cotton was elected chairman of the Board of Supervisors. Cotton was also chairman of the Polk County Board of Social Welfare. Besides Cotton its members in 1944 were Hitz, Dewey, Elson, and Mrs. M. L. Northup, who was not a member of the Board of Supervisors. Hild was made chairman of the

Juvenile Home committee. This home was in east Des Moines. Elson was the other member of the committee. Hild was vice-chairman of the auditing committee of which Elson was the chairman. Hitz was chairman of the County Home committee and Elson was vice-chairman.

At the organization meeting in January 1945, Cotton was again chosen chairman of the Board of Supervisors. The chairman and members of the various committees, including the Board of Social Welfare, were the same as in 1944. In January 1946, Charles E. Parmenter had succeeded Hitz. Cotton was again made chairman of the Board. Parmenter was made chairman of the County Home committee, and Elson, vice-chairman. Elson was chairman of the auditing committee, and Hild was vice-chairman. Hild was again made chairman of the Juvenile Home committee. The Board chose as the Board of Social Welfare for 1946, the following members: Cotton, chairman, Parmenter, Elson, Dewey, and Mrs. M. L. Northup.

Hild was never a member of the County Home committee or the purchasing committee, and the journal of the Board of Supervisors does not show that he was a member of the Board of Social Welfare in 1944, 1945 or 1946. It was one of the large departments under the control of the supervisors, and its committee was the largest committee of the Board of Supervisors. This department occupied a separate building on West Fifth Street north of Keosauqua Way and employed about seventy-five people in 1945 and 1946. It had charge of the indigent, the old-age pensioners, the dependent children, and the blind. Mr. H. H. Thompson was the director or superintendent of this department and overseer of the poor, and had been for many years. It had its own auditing department in charge of Mr. Leon J. Huss, who had been so employed for a long time. George F. Greenlee was a purchasing agent for the department until his death in 1946.

The Board of Supervisors usually met twice a month. In some months there were three meetings. It met on the call of the chairman. Each year from 10,000 to 12,000 claims were presented to the Board for approval—several hundred at each meeting. Each claimant furnishing material, produce, merchan-

dise, goods of any kind, or services to any department of the county was required to furnish to that department an itemized invoice or statement thereof with the charges and the written oath of the claimant attached that the account was just and true and unpaid. The person in charge of the department then made a written requisition or purchase order to the Board of Supervisors, usually with the approval of the chairman of the committee having supervision of the department, or the requisition or purchase order was signed or approved by that chairman. If the department receiving the merchandise or the service was the Board of Social Welfare, its auditing department first examined the invoice as to computations and charges and noted its approval before the requisition was made.

The claim was then presented to the office of the county auditor where a printed blank, back or cover was attached to the claim. The date of the filing was then stamped on the cover by the auditor, and the number of the claim in consecutive numerical sequence was noted on the cover and the claim was entered in the claim register. After the claim was checked and audited as to computations and additions the accumulated claims would be taken in baskets to the chairman of the auditing committee of the Board of Supervisors. Mr. L. O. Linstrum, County Auditor, who had been in that office in some capacity since 1918, testifying about the procedure after the bills had been submitted to the chairman of the auditing committee, said:

"After he examines them he passes them on to other members of the auditing committee. If the bill is approved by three members, it is brought back to the county auditor and if the claimant is in a hurry for his money, we issue the warrant, but that is only a smaller per cent of the bills that are handled that way. There are really three ways the bills are handled. Most bills came in and they were audited and then the Board allowed them; then the warrant was issued for them. As to the other two ways, one was when a claimant was in a hurry and the Board meeting was two weeks in advance, we would pay it on three members' signature acting as an auditing committee. Then there was a certain amount of bills that came in late and the auditing committee didn't have them in time to audit them, and the chair-

man of the auditing committee didn't want to take the responsibility of auditing them, so we took them to the Board and they took individual votes on those bills."

Concerning the practice of paying bills on the signature of three members before the Board was in session, Mr. Linstrum further testified: "That practice had been in force for many years. It was changed on January 1, 1947. This was the meeting when Roy J. Hild, the defendant herein, was elected Chairman of the Board."

The Board of Social Welfare apparently had a supply of the printed blank backs for claim covers and all claims from that department had the backs attached before presentation to the county auditor, and the stamp of the department thereon showing the audit by Leon J. Huss, and the submission for approval by Geo. F. Greenlee and H. H. Thompson, evidenced by their signatures. On each claim cover or back were the printed words: "We hereby certify that we have audited the enclosed bill and recommend payment of the amount indicated", with blank lines for the signatures of the auditing committee. A more complete description of this cover or back and of the printed requisitions is set out in the opinion in State v. Cotton, 240 Iowa 609, 615, 616, 33 N. W. 2d 880, 884, 885.

It appears without dispute that it was the uniform rule of the Board of Supervisors during all of the time that defendant was a member to approve any bill that was presented with the approval, or on the order, of the chairman of any committee of the Board. However, bills were approved that did not have the O.K. of a chairman if they were recommended by the auditing committee, especially if they were on the order or approval of the head of a department.

The indictment accusing defendant was based upon two claims of the Modern Motor Service, which were filed by Croft in the county auditor's office on August 8, 1946. They were entered in the claim register and numbered 5794 and 5793 and were identified as Exhibits 7 and 6 in defendant's trial. The auditing committee, which recommended payment of each claim, consisted of the chairman, Charles Elson, the vice-chairman, R. J. Hild, and Charles E. Parmenter. Each signified his approval

by his signature on the outside of the back of the claim. Also on the back of each claim its number was rubber-stamped, as was the filing date of the claim. There was also a rubber stamp showing each claim was audited in the county auditor's office. Also on the back of each claim was the rubber stamp of the Board of Social Welfare showing it was audited by L. J. Huss and submitted for approval by H. H. Thompson, over the written signature of each. On the inside of the back of each claim was the oath that the account was just and true and no part thereof was paid, signed and sworn to by Elmer G. Croft before Leon J. Huss, Notary Public, on August 7, 1946.

Exhibit 7 (claim No. 5974) is for $222.58. A part of the claim is invoice No. 3522 of the Modern Motor Service dated July 31, 1946, against "Polk County Welfare for 584 Gal. Ethyl Gasoline at 21c .......... $122.64."

The auditing stamp of Mr. Huss is on the invoice. An adding machine ribbon of the gallonage is attached. The invoice was corrected apparently by Huss, to show 583.7 gallons and the total charge was changed to $122.58. Attached to the invoice are forty orders showing forty separate purchases of gasoline. These purchase orders are printed blanks furnished by the Welfare Board. They are entitled "Polk County Overseer of Poor." There is a printed consecutive number on each; a blank date line; a blank line for the name of the seller; columns for the amount, article, price, and total charge. At the bottom of the order is a rubber stamp:

"William H. Cotton (facsimile)
Chairman Polk Co. Board of Social Welfare
Signed _____
Purchasing Department"

Written on the blank line of each order is the signature "G. W. Shove" or "Jean Webb", employees of the Board of Social Welfare.

All of these forty orders, except three, were for gasoline delivered by the Modern Motor Service in July 1946. Apparently each driver took from the purchasing department of the Board of Social Welfare one of these blank orders when gasoline was

required in the car being driven. Each of the seven cars of the Welfare Board was identified by a number from 1 to 7. Most of the drivers of the cars were women case-workers. When the gasoline was put in the car the driver wrote the word "Received" on the order and signed his or her name. Here is a typical order taken from the forty orders showing the writing placed on it at the time the gasoline was delivered:

"Modern Motor Service    July 5 1946
10 gal. Gas.       Car No. 3
Received
Irma W. Carlson"

The names of seven persons appear on the purchase orders in Exhibit 7. Fifteen or more employees of the Welfare Department drove these cars. They were taken from the Croft garage about 7:30 in the morning and returned at about five p.m. each day. They were often used at night. Croft testified that Thompson and Cotton used the cars most, and that other supervisors and he and his mechanic, Alfred Hill, also drove these cars. They received hard and continuous service. Each of them had been driven many thousand miles. They had been used for three years before Hild became a supervisor.

As a witness for the State on December 12, 1947, almost eighteen months after the gasoline noted on the orders was given, Croft examined the orders and, contrary to the gasoline deliveries noted on the forty orders, assumed to recall that of the gasoline to the amount of $122.58 shown on his invoice No. 3522 as having been all delivered to Polk County, but $91 worth was in fact delivered to the county, and $31.58 was not so delivered. This examination immediately followed:

"Mr. Thayer: Q. Will you tell the court and jury to whom, if anyone, you delivered the gasoline that you charged to Polk County in invoice No. 3522, but which you did not deliver to Polk County? A. The gasoline that was not delivered to Polk County, Iowa, in this claim went to Mr. Parmenter, Mr. Cotton, and various other officials of Polk County."

It may be noted that Croft did not name the defendant as being among the supervisors or "various other officials of Polk

County" who received any of the $31.58 worth of gasoline. Mr. Thayer then asked: "Q. Will you tell the court and jury whether or not Mr. Hild ever paid you out of his own funds for the gasoline that you put in his car during the month of August, 1946? A. No, sir." There is no evidence in the record that the Modern Motor Service or Croft ever delivered any gasoline to defendant or Polk County, in August 1946 or thereafter, except ten gallons to L. Mortenson for car No. 4, on August 1, 1946, thirteen gallons to Irma W. Carlson for car No. 3 on August 2, and nine gallons to J. E. Winegardner for car No. 2 on August 3, 1946.

The other charge item in claim No. 5794 (Exhibit 7) is invoice No. 3505 of the Modern Motor Service dated July 31, 1946, and requisition No. 1424 of the Welfare Board, approved by H. H. Thompson, stating a charge for "storage and service for month of August, 1946—$100." Croft testified that this service was rendered to Polk County. So that of this claim No. 5794 for $222.58, which the indictment charged Hild with obtaining from Polk County by false pretenses, the State's evidence prima facie showed that $191 of it, or 85 per cent plus of the services and gasoline charged for was received by Polk County.

The State introduced in evidence, over defendant's objection, other claims filed against Polk County by Croft, which defendant had recommended for payment as a member of the auditing committee. Croft testified that these claims were wholly false or false in part. They were offered and received in evidence, and the court so instructed the jury, as bearing upon the knowledge and intent of Croft in making the representation in connection with the claims, Exhibits 6 and 7, upon which the indictment was based, and, likewise as bearing upon the knowledge and intent of defendant in aiding or abetting Croft with said Exhibits 6 and 7. These other claims of so-called similar transactions were Exhibits 8 to 29, both inclusive, Exhibits 35 to 66, both inclusive, and Exhibit 77.

About fifteen or more of these exhibits, whose consideration by the jury was limited to said issue of knowledge and intent, were like Exhibit 7 and contained almost entirely charges for sales of gasoline evidenced by purchase orders as in Exhibit 7

described above. Croft examined these exhibits and assumed to recall the specific portion of each sale reported as delivered to Polk County which was not in fact so reported. Examined by the State as to Exhibit 15 containing thirty-three sales of gasoline to the Polk County Home in April 1945 Croft testified to each sale. His testimony covers pages 198 to 202 of the abstract. Here is a sampling of his testimony:

"Inv. 1125 for 15.5 gallons @ 18c for $2.78—half delivered to county.
"    1121 "  7     "   "   "   "   1.26   "      "      "      "
"    1104 "  9.5   "   "   "   "   1.70   "      "      "      "
"    1100 "  10    "   "   "   "   1.80   "      "      "      "
"    1124 "  14    "   "   "   "   2.52   "      "      "      "
"    1120 "  5     "   "   "   "   .90 all of this was delivered."

Testifying to gasoline sold to County Home in April 1946, as shown by Exhibit 45, in which the invoices show gasoline delivered with gasoline tickets attached for stock truck, pickup truck, fire truck and automobiles for $170.94 he said, "Approximately $40 of this gasoline was actually delivered to Polk County. The rest was put in Cotton's car, Parmenter's car, and Hild's car, and various other Polk County officials." On the invoice dated April 30, 1946 is the following lead pencil computation:     "F    170.94
          G     40
          ————————
          NG    130.94 "

Testifying on pages 255 and 256 of the record to gasoline sales to County Home in February 1946, as they are shown on Exhibit 55, he continues as follows:

"Inv. 2280, 130 gallons for $27.30—Polk County received $10 worth
"    2279, 101    "    "   21.21    "      "      "      "      "
"    2276, 169    "    "   35.49    "      "      "      "      "
"    2282, 118    "    "   24.78    "      "      "      "      "
"    2277, 116    "    "   24.36    "      "      "      "      " ."

The other claim, No. 5793, Exhibit No. 6, on which the indictment is based, is for $480.49, and it states on the outside of the back of the claim that it is for "Repairs, labor & parts used on County cars, oil." This claim contained fourteen invoices containing fifty-four items for repairs, parts, labor, oil, grease,

etc., for all of the Welfare cars. The invoices are set out in seven requisitions, all approved by H. H. Thompson. Croft testified that not one item charged for in the invoices was ever furnished to Polk County. Notwithstanding, all of these cars had been in continuous service for three and one-half years before the claim was filed. Croft testified:

"Q. You never made any honest repairs for the department of Public Welfare for the first half of 1946, and for the year 1945, is that the way you want to be understood? A. Very few. The cars were all new. * * * The cars had been purchased in 1942. The most miles on any one particular car was 45,000. That was the car Mr. Thompson was driving."

However, the testimony of Mr. Hill, Croft's mechanic, was not in agreement with that of his employer. Hill testified: "We spent a lot of time servicing the cars belonging to the Welfare Board." Croft also testified: "Towards the end of—well, toward the end of 1946 we really fixed them up for good. I mean by that we really put them in shape so far as looks, paint, and mechanical condition was concerned. We started working the first of August and ran clear up to December 1946." The charges in claim No. 5793 run through July and into August 1946. They average less than $70 for each car. There was nothing unusual about the work done or that would impress one that there was anything peculiar, fictitious or dishonest about any of the repairs made or parts supplied. The cars were all used in similar service under like conditions with the same operators. The repairs were those reasonably and ordinarily to be expected from the use which the cars had. Invoice 3529 (July 27, 1946) was the placing of a clutch plate and bearing, with the labor on car No. 2, the Chevrolet coupe, for a charge of $19.75. Someone had written the words, "Hild's car" on the invoice. The county auditor testified that it had been placed there after it was taken from his office. The State offered no explanation. Hild had owned no car for three months prior to July 22, 1946, when he bought a new Chevrolet sedan. The service charged on July 27, 1946 was not likely made on this new car. This interpolation was but one of scores of other written comments on many exhibits,

all of them unfavorable to the defendant, e.g.: the words and abbreviations "false", "N.G.", "N.D.", "Not Del.", "too much gas", "½ false", "½ delivered", "$100 N.G.", "$430.14 N.G.", "half delivered and half not", "None Del.", "½ of this", "total gas $146.28 good 46.28 N.G. 100". Many other variations of these writings could be set out. The county auditor testified that these markings were not on the claims when they were delivered to the county attorney's office. Croft had access to all of the sixty or more claims. Someone had placed scores of check marks and crosses on the items in a great many invoices and requisitions in these exhibits other than the exhibits on which the indictment was based. Even a cursory comparison of these check marks and crosses with Croft's testimony indicates that they were a guide and aid to him while he testified, for with hardly an exception, every item checked was said by him to be false. These checked exhibits would tend to give added weight to his verbal testimony. Objection was made to each checked or marked invoice or requisition. The objections were overruled with a verbal direction to the jury to give no consideration to the comments, markings and check marks. No such written instruction was given to the jury. Whether any instruction would cure the error, if any, might be questionable. These matters present no issue for decision because no error was assigned. We set them out because they have some bearing on errors assigned. Invoice No. 3533 was for a master cylinder, two pints of brake fluid, new oil flue, four wheel cylinders for the panel truck (No. 7) for a charge of $37.15. Requisition No. 1429 (August 7, 1946) was a complete set of floor boards and side panels for this truck. The charge was $60. Requisition No. 1428 (August 7, 1946) for car No. 5 was an overhaul of front end suspension system, two knuckles, left knuckle support, ring pin repair set, four bushings, one lower armshaft, two springs, two shocks—total charge $65.95. Requisition No. 1431, car No. 6, one speedometer head complete, one speedometer chain and cable housing, one speedometer gear at transmission—the charge $29.10. Requisition No. 1427 (August 6, 1946), one battery each in cars No. 4 and No. 6. For car No. 4—generator exchange, voltage regulator, labor on electric system, two headlight bulbs, universal joint,

clutch release bearing, release fork, disk and facing, pressure plate and cover, spline shaft, repair speedometer, repair speedometer on car No. 2, labor on entire job. The charge was $111.95. Requisition No. 1426 (July 8, 1946) (car No. 3)—overhaul steering gear column, pitman arm, cross shaft, tube and worm, set of worm bearings, two bearing cups, caster, camber and toe-in, straighten front wheels, set of front wheel bearings, labor—the charge $57. Requisition No. 1430 (August 7, 1946) (all cars) oil change in each (July 1, 1946), pack front wheels, change tires rear to front and front to rear, align front end system and set kingpin, change oil in all cars (August 1, 1946). The total charge was $94.

All invoices in claim No. 5793 audited by Leon J. Huss and all requisitions were issued and approved by H. H. Thompson. Croft testified that no part of the merchandise or the labor stated in said claim was delivered to Polk County; that he knew the claim was false when he filed it and that he filed it for the purpose of defrauding Polk County. This testimony of Croft, if believable, was sufficient to make a prima facie case that claims No. 5793 and No. 5794 were false and were filed with the intent to defraud, but was insufficient to establish that defendant knew they were false and that they were filed with fraudulent intent. The State brought in no witness to corroborate the testimony of Croft with respect to these two claims or to their falsity or to any guilty knowledge or purpose on the part of Hild. There can be little question that there were witnesses available who could have given testimony bearing upon the verity or the falsity of these claims. The prosecution made no showing that the evidence was not available. As said by Justice Evans in Nehring v. Hamilton, 210 Iowa 1292, 1295, 232 N. W. 655, 656: "In weighing this evidence, the judicial mind *naturally seeks for just such corroboration.*" (Italics ours.) In fairness to the State and to the defendant and to the court and the jury those in charge of the prosecution should have produced such evidence or accounted for its absence. The burden was on the State to prove Hild guilty beyond a reasonable doubt. No principle of law nor the statutes required the defendant to prove himself not guilty.

The record shows that Croft had an office at his place of business in which books of account were kept of his business transactions. When parts were sold, repairs were made or services were rendered an account was kept of it. There was a book or pad of paper at the gasoline pump on which gasoline sales were recorded. If the labor or material set out in the invoices in claim No. 5793 or in claim No. 5794 were or were not furnished, the books would have evidenced it. On cross-examination of Croft this was stated:

"Mr. Doran: Do you have with you your records from the garage in the years 1945 and 1946 showing these several transactions as they appear from invoices attached to Exhibits 6 to 66 inclusive? A. No, I do not. I have no records with me. Q. Where are your records? A. I believe they are down in the U. S. Revenue Department."

Alfred Hill was employed by Croft throughout the years 1944, 1945 and 1946. He and Croft were the mechanics who did all of the repair and service work and waited on the patrons. Hill was so employed in July and August 1946. He was a witness for the State, yet the prosecuting attorneys did not ask Mr. Hill a single question about a single item in either claim No. 5793 or No. 5794.

Invoice No. 3527, bearing date of July 30, 1946, in claim No. 5793 is a charge for making a complete set of floor boards and side panels for the Chevrolet panel truck, car No. 7. Written on this invoice bill are these words: "Made by Lagerquist Co." The county attorney of Polk County and his assistant, Thayer, very likely knew that the Lagerquist Body Company was located at 514 on Second Street in Des Moines, and that someone connected with that company would know, and its books of account would show, whether the work on the panel truck was done, yet the prosecutors produced neither. In the words of Justice Weaver in a like situation in Shideler v. Naughton, 163 Iowa 616, 619, 145 N. W. 280, 281, "it is a reticence * * * of material significance."

The names of the drivers of the Welfare cars who procured the gasoline were written on the gasoline purchase orders in claim No. 5794. The orders show the delivery of 583.7 gallons

for a charge of $122.58. Croft testified that they received $91 worth but that $31.58 worth or 102 gallons went to certain named supervisors and other Polk County officials. These seven persons probably had some knowledge of the facts, but the prosecution did not call them.

It is a sound and well-established principle of law that where a party to a court action has in his control or available to him evidence properly a part of his case and to whose interest it would naturally be to produce, and he fails to do so, without explanation, it is a reasonable inference that if produced it would be unfavorable to his cause. See State v. Cotton, supra, 240 Iowa 609, 625, 33 N. W. 2d 880, 889, 890, and authorities cited.

In seeking to bring direct knowledge to the defendant of the falsity of claims No. 5793 and No. 5794 and of Croft's intent to defraud, the State elicited this testimony from Croft: "Previous to filing Exhibits 6 and 7, I had a conversation with Mr. Hild about these two claims. I says to him, 'Sign these things so I can get my money back on that car of yours.' He looked them over and said, 'O.K., that takes care of that, that was done in a hurry, wasn't it?' I said, 'Yes'. That was all there was to it." Hild denied this.

The procedure of first getting the purported audit and recommendation of payment from a member of the Board before having the claim processed in the regular course through the auditor's office was contrary to the testimony of the auditor and of his deputy with respect to the regular procedure and practice. It would seem that the safer procedure for one trying to procure the allowance of a false claim would have been to follow the usual method and requirements. Clerks in the county auditor's office testified that it was the practice to carry the claims in wire baskets from that office to the auditing committee. Mrs. Dorothy Robinson, a witness for the State, who had been a clerk for the supervisors for almost four years, including the years 1944, 1945 and 1946, testified: "While I was a clerk in the Board of Supervisors' office, I never saw Elmer Croft bring any claims to the auditing committee. They were brought in from the auditor's office by either Monty St. John or Julia Corcoran." Hild denied the conversation with him as testified to by Croft.

The warrant for the claims No. 5793 and No. 5794 was not issued merely on the signatures of the auditing committee, but the claims were presented at a meeting of the Board of Supervisors and allowed in the ordinary course of procedure on August 9, 1946, and warrant A-49864, payable to the order of "Modern Motor Service", for $703.07 was issued on August 12, 1946.

I. Defendant assigned error in the overruling of his motion, filed at the close of the State's evidence and renewed at the conclusion of the testimony, for a directed verdict in his favor because of lack of corroboration of the accomplice, Croft, as required by statute.

The testimony of Croft is the only direct evidence that the defendant had any knowledge of the falsity of claim No. 5793 or of claim No. 5794 or any knowledge that Croft filed them with the intent to defraud Polk County. No other witness testified to such knowledge of defendant.

It was the law of the case by instruction of the trial court that Croft was an accomplice of defendant in the crime charged. Section 782.5, Code of 1946, provides that: "A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence *which shall tend to connect the defendant with the commission of the offense.*" (Italics ours.) The italicized words contain the essence and the vital part of the quoted section. As expressed in the words of the statute mere corroboration of the testimony of the accomplice is not in itself sufficient to convict. It must not only corroborate the testimony in some material part, but it must also be evidence which fairly tends to connect the defendant with the commission of the offense. We have so held: State v. Christie; 193 Iowa 482, 486, 487, 187 N. W. 15; State v. Winters, 209 Iowa 565, 567, 228 N. W. 286; State v. Pauley, 210 Iowa 192, 195, 196, 230 N. W. 555.

To corroborate Croft's testimony that he talked with defendant before the claims were filed and at the time defendant wrote his name under the recommendation for payment in which conversation he told defendant that the claims were filed to reimburse Croft for the balance owing him on the purchase price of the car, and to tend to connect Hild with the crime, the State relies upon the testimony of Mr. Boelter that Croft just previous to the filing of the claims bought a new Chevrolet sedan from the

Manning Chevrolet Company for Hild. For a more complete understanding of that transaction we set out its history: When Hild became supervisor in January 1944 he owned a 1940 Plymouth sedan which he wrecked in a collision on April 22, 1945. His insurance carrier sold the wrecked car, which was damaged beyond repair, to Owen Crist for $210, for which amount Crist gave his check to Hild on April 27, 1945. The insurance company settled with Hild for an additional sum of $780 evidenced by draft. Hild was without a car and needed one as a supervisor. Cars were hard to get. Croft had learned through Parmenter of a car for sale at Indianola and Croft bought the car—a 1941 Dodge sedan—for $1400 from Homer Hess. Both Parmenter and Hess testified that the price was $1400, which amount Hild paid by endorsing the Crist check for $210 and the insurance draft for $780 and giving his own check for $610 dated April 30, 1945. It is clear from the record that these payments were made. The checks with Croft's endorsements were in evidence. But Croft testified that he told Hild he paid Hess $1900 for the car and that he had to have that much money, and that Hild told him he would take the car for that price, but that he could invest only $1000 in a car, and that the $610 would be a loan to Croft, which he could pay back $200 at a time, and that the balance of $300 Croft would have to get in some other way. The State in argument concedes that there is no corroboration for Croft's testimony as to the $610 loan and his version of the transaction. It is a rather strange story that Croft tells about Hild loaning him $610 to be repaid in installments, when, according to Croft, they were both engaged in robbing the county.

Hess was a witness for Hild. He was chief engineer at the pumping station of the Great Lakes Pipeline at Roland, Iowa. He testified that he sold the Dodge sedan to Croft for $1400 in 1945; that he had never met Croft before but he knew Parmenter. He also testified:

"I had a conversation with Mr. Croft in 1947. It took place at the station at Roland, Iowa. He and a deputy sheriff, I believe it was Hildreth, and another person came there. The deputy sheriff came into the station and asked if I would go out and talk to them awhile. He asked me if I remembered Mr. Croft

and I said I believe I know who he is and we shook hands. He made me acquainted with the other gentleman but I don't remember his name. The deputy sheriff did the talking, but we were all inside the automobile, including Mr. Croft. Mr. Croft said: 'I thought I gave you around $1800 for that car.' I said, no, you did not. I told him what I received for the car.

"Re-cross-examination by Mr. Thayer: Whatever I said was written down by the deputy sheriff."

This trip of Croft to Roland in the escort of Deputy Sheriff Hildreth was probably during the period when Croft was out on release from the penitentiary. No witness disputed the testimony of Mr. Hess.

Defendant drove the Dodge sedan for almost a year. When his work was at the courthouse, as much of it was, he would park his car near by where it could remain until he returned home after work. He usually left the car key above the sunshield. He sometimes had his car serviced at Croft's and Croft knew where the car was usually left. Hild testified that about March 1, 1946, when he went for his car that evening he could not find it. Croft's place was close by and he went over there and Croft told him he had sold the car. Hild was angry and gave expression to it, and told Croft he wanted the car or $1600. Croft told him the car was on the way to Utah, but not to get too stirred up as he would get him a new car in a few days. Hild consulted a lawyer. For some time he used a car of one of his relatives. Then he drove one of the Welfare cars for about two weeks. He took the car in the evening and returned it in the morning. Croft was promising that he would soon get a new car, and until then he could use an old car which he had. Hild drove this old Chevrolet, which he testified had no registration certificate, while he was campaigning for the June primary. He learned that Croft had sold the Dodge to the Luscombe Used Car Company on March 5, 1946. Croft told him he had received $1150 for it. Croft testified that he heard Hild complaining to other Board members of the treatment he had received from Croft with respect to the Dodge car and he got "mad" and went to the bank and brought back $1000 and threw it on the table. Hild and Parmenter testified that the money was immediately counted

and there were seventeen $50 bills. On July 22, 1946, Croft telephoned Hild that his new car was at the Manning Chevrolet Company. Hild asked him the price and Croft told him it would be between $1150 and $1200. Hild went over and looked at the car and signed the application for registration. Later that day the car was delivered to Croft. Hild testified that he and Parmenter walked from the courthouse to Croft's place where the new black Chevrolet was parked in the street; that he figured that his Dodge was worth $1600 and that Croft still owed him $750 of that sum, and that $450 added to that amount would pay for the car at $1200. He testified that he got behind the wheel and counted out $450 of the cash which Croft had previously given him and handed it to Croft and told him that they were fully settled; that Croft put the money in his pocket and walked into his place of business and that he drove the car away. Parmenter's testimony corroborated what Hild said took place. Alfred Hill testified that he never saw Hild at Croft's place after that date. The evidence is that Croft paid the Manning Chevrolet Company $1179.78 on August 7, 1946. It was Croft's testimony that Hild paid him $700 on July 22, 1946, when the car was delivered and that he never paid him the balance of $479.78 on the car. It was this balance that Croft testified he had reference to in his conversation with Hild at the time the two claims were filed.

Croft does not deny that he took Hild's Dodge sedan and sold it to the Luscombe Used Car Company and that he received $1150 for it. Nor does he deny that he signed Hild's name to the assignment of the registration certificate in the Luscombe transfer, but he testified that Hild had previously told him he would like to sell his old car and get a new one, and that he told Croft over the telephone to sign his name to the transfer application. Hild denied all of Croft's statements.

Croft also testified that the old Chevrolet which he let Hild drive while he was waiting for the new car to arrive which Croft was getting for him, was a car which he had rented from Ted McGrevey, and that he told Hild it would cost him $315 a month. Hild denied Croft's testimony, and said that Croft, having deprived him of his car, had agreed to furnish him transportation until he received his new car. The State used McGrevey

as a witness. He identified a memorandum showing that car No. 100 had been rented to Croft on April 23, 1946, and was returned on July 22, 1946, and that the mileage for that period was 3170 and the charge was $225. He testified that Croft was renting a number of cars at that time and he did not know how much he paid him for any car, as he paid some by cash and some by work. He gave no testimony as to who used any of the cars rented to Croft and apparently had no knowledge whether Hild used one.

The State put in evidence Exhibit 47 being claim No. 2768 for $345.42 filed April 25, 1946, for five large electric fans for use at the Juvenile Home, allowed by the Board April 30, 1946. Of the approximately sixty claims which the State offered in evidence as being fraudulent in part or entirely, this Exhibit 47 is the only one in which the requisition or purchase order was made by the defendant. Of the sixty or more claims received in evidence the largest number were requisitions for the Board of Social Welfare. The second largest number were for the County Home. One was against the Court Expense Fund, and one, Exhibit 47, was for the fans ordered by Hild for the Juvenile Home. While the State, in its printed argument, lists Exhibit 47 as wholly false, that is a misstatement. The five fans—four window and one pedestal—were delivered to the Juvenile Home on July 5, 1946. That was the testimony of Mrs. Belle M. Turner, the Superintendent of the Juvenile Home, at that time. Croft testified that they were delivered on that date, and Mr. Ramsay of the Duffy Tire Company testified that on July 5, 1946, his company delivered ten electric fans to Modern Motor Service for $735.28, and was paid for them. All of these witnesses were for the State. Polk County was not defrauded by this claim but received full value for its warrant. The defendant's objection to the admission of the exhibit was good and the court erred in receiving it as bearing on defendant's knowledge and intent. State v. Cotton, supra, 240 Iowa 609, 33 N. W. 2d 880. Croft testified that the warrant received for the fans was used to pay McGrevey. There is no corroboration of this testimony. If the warrant *was* so used, Polk County was not injured thereby.

Hild testified that in March 1946, when his daughter was about to graduate as a nurse, Croft told him that when his own daughter graduated he bought flowers for a bouquet for the class and a corsage for each graduate. Hild told him he liked the idea and Croft said to let him buy the flowers as he did trucking for some florists and could get them cheaper. A florist, Smith, testified that Croft telephoned an order for the flowers and he delivered them at the exercises, and that about a month later Croft gave him a check for $83.64 in payment of the flowers. Hild testified that after the exercises Croft told him the charge for the flowers was about $28, and he gave him three $10 bills.

Hild testified that in talking with Croft sometime before his daughter's graduation he told him he and Mrs. Hild were going to get a diamond ring as a graduation gift for the daughter, and Croft said that he could get a good ring cheaper than Hild could. A wholesale jeweler, Russell, testified that Croft, who had sometime before made a purchase, looked at some ladies' rings once or twice and finally chose one and had it mounted and paid $262.30 cash for it and said he was getting it for another fellow. Hild testified that Croft brought him rings at different times which were not suitable, but later he took one his wife liked to a jeweler who appraised it, and that he told Croft what the appraisal was and offered him $175, which he accepted.

In the primary election in June 1946, Hild, Walter J. Jones and George C. Jones were all candidates on the Republican ticket for supervisor in the second district. Croft testified that in March 1946, Hild told him to get some small cards for George C. Jones, and that he had Phil Wright print them at a cost of $53, which Hild did not repay him. Wright testified that he did the printing and Croft paid him $28 or $29 for it. In Jones' affidavit of election expenses he stated that small cards and posters were "Donated by Friends." Walter J. Jones testifying for the State said that he was a candidate with Hild and George C. Jones for the Republican nomination of supervisor in the second district, and that he received 800 votes. George C. Jones received 400 votes and Hild received 2000 votes. George C. Jones testified that some posters and cards were furnished him by someone about a week before election, some of which he

distributed. He did not know who donated them. Hild denied Croft's testimony and said he had no connection with the providing of any advertising for Jones.

It is the contention of the State that the witnesses Boelter, Luscombe, McGrevey, Ramsay, Turner, Robinson, Smith, Russell, George C. Jones, Hill, Walter J. Jones, and Wright, each gave testimony corroborating Croft and testimony by him against defendant respecting the crime charged against him in the indictment and the claims on which it was based which tended to connect him with the commission of the crime. Croft testified that claim No. 5794 was false in part, and that claim No. 5793 was all false, and that each claim was filed by Croft for the purpose and intention of defrauding Polk County, and that he told the defendant the claims were filed to obtain money to reimburse Croft for the balance owing him by the defendant for the purchase of defendant's new Chevrolet sedan.

The only witness who gave any testimony about the new car was Boelter, and he said nothing about Croft's testimony that the claims were false and filed with the intent to obtain money falsely from Polk County to reimburse Croft for money owing him on the car purchase price by Hild. His testimony in no manner or degree tended to connect Hild with the crime charged. He simply testified that Croft bought the car for Hild from the Manning Chevrolet Company and paid the purchase price, and thereby corroborated Croft's testimony to like effect, but it did not tend to connect Hild with the offense. The fact that Croft bought the car for Hild did not tend to connect Hild with the crime, and that is the only fact that Boelter's testimony disclosed. Hild did not even employ Croft to buy the car. But after Croft had deprived Hild of his car, he was placed in the position of insisting upon the return of his car or its value. Croft could not return the car and he promised to replace it and return its value by getting Hild a new car. Croft, at the time he made the promise, had in his possession sufficient of Hild's property to buy the new car. Certainly it is not and ought not to be the law that the position in which one is forced without his fault and against his will should effect his implication in and connect him with a crime which he had no intention to commit.

It is Croft's testimony that the claim, No. 5793, was falsely concocted to secure money to pay him what Hild owed him on the car. Who testified that there was an unpaid balance? The answer is that no one but Croft so testified. Does anyone's testimony corroborate him in this? The answer is that the testimony of no one does, not even that of Boelter. Does the fact that Boelter's testimony corroborated the testimony of Croft that he bought the car for Hild, lend verity to Croft's testimony that the claim was false and Hild knew it? In other words, did the fact that Croft told the truth when he testified that he bought the car for Hild make his other testimony as to the falsity of the claim more likely to be true? It most certainly does not. Buying the car was a legitimate business transaction on the part of both Hild and Croft. Filing a fraudulent claim was a criminal transaction. The making of the honest transaction in no way tended to connect Hild with the making of the dishonest one. Honest transactions do not ordinarily beget dishonest ones. The purchase of the car by Croft for Hild is no more consistent with Hild's guilt than with his innocence. The purchase of the new car by Croft, which was the only fact of which Boelter testified, is just a single circumstance, and insufficient corroboration under said Code section 782.5.

In State v. Graff, 47 Iowa 384, 385, the crime was burglary. A witness for the State testified that he and defendant committed the burglary and hid the loot in a barn of defendant's father. The barn was at the home where defendant lived with his father. A peace officer testified that he found the stolen property in the barn and that defendant and his father were in the barn at the time. In reversing the judgment, this court said:

"In our opinion the testimony of Deckart [the officer] did not corroborate the testimony of the accomplice. It did not, we think, tend to prove the crime with which the defendant was charged. The stolen goods were not found in his possession nor upon his premises. His presence in the barn doing nothing when the goods were discovered is not a circumstance against him. * * * Whether employed or unemployed he was where he might as naturally be expected to be as anywhere else. Nor do we see anything in the fact that he was there when the marshal

was searching for the property. *In our opinion his presence is quite as consistent with his innocence as his absence would be.*" (Italics ours.)

See also State v. Moran, 34 Iowa 453–455; State v. Pauley, 210 Iowa 192, 195, 230 N. W. 555.

To admit testimony such as that of Boelter, Luscombe, Russell et al., supra, as corroborative of Croft's testimony, would announce a rule that would permit any criminal who has a legitimate business on the side, by perjured testimony and planned conduct, to connect the crime with which he is charged with any innocent customer who does business with him. See State v. Pauley, supra; State v. Duncan, 158 Iowa 652, 138 N. W. 913.

How could Luscombe's testimony that he bought Hild's Dodge sedan and thus forced him into getting the new Chevrolet from Croft tend to corroborate Croft's testimony implicating Hild? It has no such tendency. Hild had nothing to do with the Luscombe purchase. McGrevey's testimony did not corroborate Croft on any testimony whatsoever which Croft gave about the crime, or Hild's guilty knowledge of it. McGrevey knew nothing about Hild's driving one of his rented cars nor did he know what money or service he received from Croft was applied on the rent of any particular car. If Croft's story be accepted as true that he told Hild the rented car would cost him $315 a month it was a legitimate transaction, and just as consistent with Hild's innocence as with his guilt. It seems unlikely that Hild would agree to pay more than a new Chevrolet would cost for four months use of an old one, especially when Croft had deprived him of car service and agreed to furnish him with it without charge until he procured him a new car.

What we have said about Boelter's testimony and McGrevey's and Luscombe's applies with equal force to the other transactions. They were all legitimate. None of them was criminal, questionable or suspicious. None of them had any reference to the crime charged, and none of the testimony corroborated Croft or any of Croft's testimony respecting the indictment or tended to show guilty knowledge or fraudulent intent on the part of Hild or tended to connect him with the accusation against him. Hild

said he paid Croft what he was willing to accept for the flowers and the diamond. Croft testified that he did not, but no one corroborated him. Russell and Smith did not. Croft did not testify that there was any fraudulent intent to obtain money through claims No. 5793 and No. 5794 to reimburse him for any expenditures in any of these transactions.

The State contends that the fact that defendant wrote his name on the backs of the two claims is in itself corroboration of Croft's testimony tending to connect defendant with crime for which he was indicted. There is no merit in this assertion. Defendant, as a county supervisor, had a duty to perform in passing upon claims against the county presented to the Board and to the auditing committee of which he was vice-chairman. If nothing appeared against the validity of these claims it was his duty to approve them. There was nothing on the face of claims Nos. 5794 and 5793 impeaching their validity or subjecting them to suspicion. The placing of his name on them signifying his approval and recommending their payment was consistent with honest conduct and with his innocence of the crime charged.

The question of corroboration of an accomplice or his testimony in each case depends largely on its own particular facts. State v. Pauley, supra, 210 Iowa 192, 195, 230 N. W. 555. Suppose that an outlying building was burglarized about midnight and a witness testified he saw the defendant walking around the premises at 10:30 p.m. Unexplained, this might look suspicious, but if it is established that his calf or his boy's pup had strayed from home and he was searching for it a different complexion is put on the situation. His being there was consistent with his innocence. It is our conclusion from a full and careful examination of the voluminous record and mass of exhibits and the briefs and arguments that the testimony of any or all of the witnesses relied on by the State does not show such corroboration of the testimony of Croft, the accomplice, as section 782.5 of the Code of 1946 demands for the conviction of the defendant.

In State v. Clemens, 38 Iowa 257, 258, a judgment against the defendant was reversed. After quoting the statute requiring the corroboration of an accomplice, Justice Cole, for the court, said: "We confess that the testimony of the accomplice, and the

circumstances of combination and influence under which he testifies, as shown by himself, almost wholly destroy the claim of any credibility whatever." The quotation applies with perfect pertinence to the accomplice in the case on appeal.

II. We have referred to the admission of numerous exhibits consisting of other claims which Croft testified contained false claims filed with his intention to obtain money from Polk County by false pretenses. Since he testified that they were false and were filed by him with fraudulent intent, any application these exhibits would have would be to the knowledge and intent of defendant.

This court has held in several decisions that corroboration may be shown by either direct or circumstantial evidence. We have stated in the division just preceding that there was no sufficient corroboration of Croft or his testimony by direct evidence. The circumstantial or indirect evidence in this case would be largely if not wholly connected with these exhibits of other transactions. It was the contention of defendant below and also expressed on appeal that these other exhibits had no bearing upon and should be given no consideration on the issue of corroboration of the accomplice. He cites respectable authority to that effect. Defendant requested an instruction that these exhibits and any evidence of these other transactions were admitted with the limitation that they should be considered only as bearing upon the knowledge and intent of defendant and should be considered for no other purpose, and could not be considered as evidence corroborating the testimony of Croft. The court did not give the requested instruction, but did instruct that the evidence should be considered as bearing upon the knowledge and intent of Croft in making the representations as to Exhibits 6 and 7, and as bearing upon the knowledge and intent of the defendant in aiding and abetting Croft. The court gave no specific instruction that these other exhibits should or should not be considered on the question of corroboration. Defendant argues that such an instruction should have been given. The State urges that the plain meaning of the court's instruction was that consideration of the exhibits should be limited to knowl-

edge and intent and was a compliance with the requested instruction.

The question whether these exhibits should be considered on the issue of corroboration was not argued by the State in print, and in oral argument to this court the first assistant Attorney General stated that the State was making no contention that the exhibits of other transactions were to be considered on the issue of the corroboration of the accomplice, Croft.

We therefore give the matter no consideration. We hold that there was no sufficient evidence of any kind of corroboration of Elmer G. Croft as required by section 782.5, Code of 1946. Defendant's motion for a directed verdict should have been granted.

It may, however, be a pertinent query, in passing, that though other claims filed at other times might on their face because of their nature reasonably and fairly give rise to justifiable question and suspicion of their honesty, should that fact generate a doubt of the honesty of a claim in the mind of one who must pass on it, which has no indicia of falsity apparent?

III. Defendant asserts that assistant Polk County Attorney, Thayer, was guilty of persistent misconduct throughout the trial in examination of witnesses, in argument to the jury and otherwise, all to defendant's great prejudice.

Not much was said by the prosecution about the charge for which Hild was on trial, but much time was spent by it on other transactions, and Thayer repeatedly by insinuation and by direct statement sought to tie Hild to claimed thievery in general by Polk County officials. We refer to some instances. Mr. Lathrum, a farmer living north of Des Moines, was a good-reputation witness for Hild. After inquiring as to his intimacy with Hild, the next question of Thayer was: "And you have been taking money from this gang of thieves for your influence down in Polk County, haven't you, Mr. Lathrum?" Proper objection being made including that the question was prejudicial, improper and misconduct, the court ruled: "Objection sustained." After other questions intimating that the witness was not frank, Thayer said: "You have a very convenient memory, haven't you?" Objection that the question was not proper cross-examination was

overruled. The witness said to Thayer: "Explain just what you mean by that question?" Thayer answered: "I am not explaining. You are the one who does the explaining."

William A. Broquist, a reputable business man of Des Moines who testified to the good reputation of defendant, was promptly met on cross-examination with this question: "Aren't you the political boss over there in the second district?"

J, C. Haley, a locomotive engineer on the Chicago & North Western Railway, testified to Hild's good reputation. Being asked by Thayer if he had heard the report that Hild and Croft had filed fraudulent claims, he replied: "I heard talk about it like anyone else would hear." Mr. Thayer said: "Wait a minute, you don't need to give us a speech, we want to know yes or no, did you hear it or not?"

By this bulldozing interrogation and comment, Thayer was seeking to belittle and discredit reputable witnesses for defendant to the jury. It is such conduct that makes good citizens reluctant to be witnesses in court.

In cross-examining Hild he was asked: "Q. And you understood, did you not * * * that you were there to protect the money in the Polk County Treasury and keep it away from the thieves that inhabited the county?" Objection was sustained.

Seeking to give testimony carrying the weight of his official prestige, though not a witness, he asked Hild: "Your name is on every one of those three *fraudulent* bills?"

Hild's attorney asked him if in auditing and recommending bills of the Board of Social Welfare he relied upon approval given them by its director H. H. Thompson, and by the chairman of that committee. Thayer said: "I object for the reason that it is a clear attempt by counsel for defendant to load the fraud of this defendant off on to some other official of Polk County." Objection was made that it was improper, prejudicial and resented by defendant. The objection was overruled.

On cross-examination Hild answered that he was employed by the Pyramid Cement Company as a salesman to contact contractors. Without any basis for the question in the record, Thayer said:

"Is that the corporation that beat so many widows and children out of their money by the sale of stock? (Objection was sustained.) Q. Now when you went on the Board of Supervisors you didn't consider yourself a greenhorn, becoming associated with a lot of slickers, did you? (Objection was sustained.) Q. When you went on the Board of Supervisors you didn't consider yourself a mere lamb being led to the slaughter by a lot of other crooks there in Polk County, did you?

"Mr. Hextell: That is objected to for the reason it is incompetent, irrelevant and immaterial, not proper cross-examination, calling for the conclusion of the witness, and we take exception to the form of the question as misconduct of counsel.

"The Court: Objection to the question will be sustained.

"Q. You knew at the time that you bought this black sedan that the OPA ceiling price was $965? (Objection was sustained.)"

Hild on answering that a claim inquired about was an honest one, Thayer, with sarcasm, asked:

"When you signed [the audit] you thought you were protecting the county treasury from the onslaught of thieves?

"Mr. Doran: We object to that as improper conduct on the part of counsel. It is not proper cross-examination. It is an attempt to get into the record and does get into the record, prejudicial matter which counsel as a lawyer should know is improper.

"The Court: The statement may go out."

When Hild was asked on cross-examination about the large purchases of tires he answered that the Board had decided to build a stock pile of tires, Thayer asked: "And violating the law? (Objection was sustained.) Q. And you were creating a stock pile of tires? I want you to tell this jury whether or not you didn't know that you were violating the law? (Objection that it was a misstatement of the law and not proper cross-examination was sustained.)"

Objections to two similar questions were sustained.

When asked if he objected "to Polk County hoarding up tires and tubes in 1945", Hild's answer that "personally, I thought

it was a good idea" was met with this remark: "And especially when they were not delivered." This was stricken on objection.

Hild was asked if he ever saw the stock pile of tires, and when he replied that he went to see them, Thayer remarked:

"That was after the investigation by Walters and Powers that you fellows hurried around to get tires and tubes and engines, and I don't know what all.

"Mr. Doran: We move to strike that as prejudicial misconduct for the county attorney to stand before the jury and make a speech like that in the trial of a criminal case, and we except to it as being improper.

"The Court: Objection sustained."

When Hild, in response to Thayer's question, said he saw between fifty and seventy-five tires in the stock pile they were building in February 1947, Thayer remarked: "To let people get fraudulent claims, just interpose no objection; get the paper work done and just let them go through." Objection was sustained.

Picking up an exhibit, Thayer said:

"And here is one, and of course that was filed in the regular way, and it is in the regular form, and it was okayed by this, that, and the other fellows, and you didn't make the slightest effort to find out whether it was an honest claim? A. If you meant, did I go out to see whether there was one pressure plate or two head lamps on a car or the frame was straightened or the labor was there to replace the damaged parts or check into all that, I did not." This question followed: "Q. I don't mean there are only twenty-seven thousand dollars worth of claims. I mean that fraudulent items in these claims amount to twenty-seven thousand dollars in the two years, 1945 and 1946; didn't you know that to be the case? (Objection was sustained.)"

When Hild in a responsive answer said that the requisition had the words "Received for all cars" on it, Thayer remarked: "I know that, that was part of the fraud." Defendant's motion to strike the remark as prejudicial misconduct was sustained.

In response to interrogation about the diamond ring for Hild's daughter, Hild answered that she had worked at the Juvenile Home a short time before, Thayer said:

"So, this Juvenile Home was quite a relief project to the Hild family, wasn't it? You had one of your brothers working at the Home, didn't you? (Objections were sustained.) Q. Well, who was Mr. Parmenter? A. Mr. Parmenter was one of the Board members. Q. He is in the penitentiary at the present time? (Objection was sustained.) Q. You know that practically the whole Board of Supervisors were getting their gasoline in that month and in fact every other month in the year 1946, there at Croft's garage, and Polk County was paying the bill? A. That is not true." The question was stricken.

The matters above set out are random samplings from many similar ones.

All arguments were taken down and transcribed and are in the record. We cite a few remarks by Thayer which have no support in the record and were not in answer to arguments for defendant:

"Now I want to call your attention to a little of the evidence about this defendant before he got into office down in Polk County. The political boss on the East side of the river in Polk County is this man Broquist that testified as a character witness for Hild. He is the political boss—

"Mr. Doran: We take exception to this as being misconduct.

"Mr. Thayer:——down there in Lee Township.

"Mr. Doran: You are not on the witness stand. We take exception to that as misconduct.

"The Court: Proceed with the argument.

"Mr. Thayer: * * * He [Broquist] is the man that picked out this man Hild, put him up for office and elected him as supervisor of the Second Supervisorial District of the county, in the month of June 1942.

"Mr. Doran: Same exception as last made.

"Mr. Thayer: Now, I get the idea from the evidence that we have heard that this man Hild never did feel any responsibility toward the taxpayers of Polk County. Why, he was elected by

the boss Broquist. He didn't have to ask me what I thought of his conduct.

"Mr. Doran: Same exception."

There was no ruling by the court.

Later in the argument, Thayer said: "Why don't we get down to the bottom of things, says Doran. Why, if you get down at the bottom of anything you would find Lant Doran there. Why, if there is any villain or any defendant or anyone charged with crime that comes into this court, if he has got the money to pay for a defense counsel, you find Lant Doran there on the job."

Objection was made, but the court did not rule.

When Thayer told the jury that Hild was lying just as Croft did in his trial, Mr. Doran made proper objection and the court said "Proceed with the argument." Mr. Thayer proceeded:

"But once in a while one of these men here turns State's evidence just like Croft has done, and instead of sticking to the lies that they told they start in and tell the truth. And, my! what a fuss that starts up when one of the gang turns State's evidence and tells on the rest of the gang. Why, he is a liar. He is a felon. He is a perjurer. Yelling murder. He is everything in the dictionary that is bad. * * * All of us thieves have got to stick together, say the Hilds, the Parmenters, the Cottons, the Thompsons, the Husses and the rest of the people.

"Mr. Doran: We take exception to that as being misconduct and outside the record.

"The Court: Proceed with the argument.

"Mr. Thayer: Oh, yes, says Hild: 'We were building a stock pile of tires.' Let me tell you something. A stock pile of tires built by Polk County Board of Supervisors would last just about as long as a snowball or a snowflake on the Fourth of July in Boone County. Yes, in twenty-four hours every supervisor, every supervisor's son, every supervisor's daughter, every supervisor's cousin, every supervisor's aunt and uncle, would have new tires on their cars. And where would the stock pile be?

"Mr. Doran: We except to these remarks by counsel as wholly a conclusion and wholly improper. That is the———

"The Court: Proceed with the argument."

There was more of this. But throughout the trial as shown by the record in this court there was no admonishment of Thayer by the court. Adverse rulings by the court were persistently and contumaciously disregarded and ignored without the slightest obedience, deference or respect to the court, and wilfully and flagrantly oblivious of the rights of the defendant. The court's remark "Proceed with the argument" might better have been left unspoken, as Thayer simply took it as a green light. The able and conscientious trial court was too tender with Thayer.

"It is the well established rule in this state that every witness is presumed in the outset to tell the truth." State v. Voelpel, 208 Iowa 1049, 1052, 226 N. W. 770, 771, and cases cited. Thayer ignored the presumption. This court has many times denounced misconduct of prosecuting attorneys in criminal trials, wilfully designed to inflame the jury and secure a verdict of guilty regardless of the rules and proprieties of court procedure. Courts are most charitable in disregarding those breaches of conduct in the trial of a case occurring through overzeal, thoughtlessness or temporary anger, or any extenuating circumstances. But there was no excuse or provocation for abusing the privileges of a prosecuting attorney as was done in this case. Speaking of those who persist in asking questions against the rulings of the court, we said in State v. Poston, 199 Iowa 1073, 1075, 1076, 203 N. W. 257, 258:

"We are unable to understand why prosecuting attorneys persist in thus infracting the well established rules of practice. This court has repeatedly warned prosecutors about these dangers * * *. The result, under such circumstances, is always the same as it is in this case. It puts into the record a reversible error * * *.

"It is apparent in this case, as in most such cases, that the prosecution realized that the matters about which they were inquiring would fall as a subtle poison against the defendant in the minds of the jury; and while they were not able to get the testimony into the case, except in an inferential way, they realized the advantage of such inference, and sought to avail themselves of it."

1154

In State v. Neifert, 206 Iowa 384, 385, 386–389, 220 N. W. 32, in reversing, the court said:

"Appellant bases a major grievance upon the proposition that the prosecuting attorney, during the trial, asked improper questions, to the extent that prejudice resulted therefrom. Objections to these interrogatories were properly sustained by the trial court; yet the county attorney continued that unallowable conduct."

In State v. Weaver, 182 Iowa 921, 927, 166 N. W. 379, 381, the court, in reversing, said: "The duty of the prosecuting attorney is not alone to secure a conviction of the guilty, whenever possible, but also to safeguard the rights of the accused, by closely observing the rules of evidence and prescribed procedure." In State v. Peirce, 178 Iowa 417, 441, 159 N. W. 1050, 1060, in reversing, we said: "It is elementary that, with or without reference to its being inflammatory, counsel should not supply evidence on material points by claim in argument." See also State v. Proctor, 86 Iowa 698, 701, 53 N. W. 424; State v. Rounds, 216 Iowa 131, 134, 135, 248 N. W. 500; State v. Nathoo, 152 Iowa 665, 133 N. W. 129; State v. McIntyre, 203 Iowa 451, 212 N. W. 757; State v. O'Meara, 190 Iowa 613, 177 N. W. 563; State v. Hixson, 202 Iowa 431, 435, 210 N. W. 423.

██ ██ Defendant complains of misconduct on the part of Thayer in the extensive cross-examination of defendant's reputation witnesses and his bad faith in said cross-examination. It is necessary that a large discretion be given to a trial court in the extent and character of each cross-examination. It, of course, must be a judicial and not an arbitrary discretion. It has always been held proper to interrogate one who testifies on cross-examination that a person's reputation in the community is good, whether he had not heard rumors and reports of matters derogatory to that reputation. We went perhaps somewhat further in State v. Wheelock, 218 Iowa 178, 184, 185, 254 N. W. 313. We are not passing on that phase of the matter, but on the interrogator's good faith in the cross-examination. The purpose of the cross-examination is to test the credibility of the witness and the accuracy of his knowledge of the subject matter. State

v. Keul, 233 Iowa 852, 860, 861, 5 N. W. 2d 849. Thayer cross-examined very largely about the false claims involved in the exhibits in this trial offered on knowledge and intent. The witnesses had all heard about these matters through the trials of Cotton, Croft, Parmenter, and Thompson and were testifying to Hild's reputation before that. The purpose of the cross-examination, according to the defendant, was to keep these matters before the jury. In other words, he contends that it was not to discredit the witness. The State never attempted to rebut the direct testimony of the witnesses by general character or reputation testimony. Of such cross-examination, speaking through Evans, J., the court said in State v. Hixson, 202 Iowa 431, 435, 210 N. W. 423, 424:

"The State used no character witnesses in rebuttal. We must assume, therefore, that the State had no evidence upon which it could impeach the general reputation of this defendant for good moral character. This fact seriously challenges the good faith of the cross-examination."

It is our judgment that the error assigned in this division is meritorious and demands a reversal.

IV.   Error is assigned because the court unduly restricted the cross-examination of Croft. There is merit in the assignment. Liberality of cross-examination is the general rule, but with Croft it would have been difficult to overstep the bounds of liberality in his cross-examination. His close relations with the office of the county attorney during his absence from the penitentiary, the low state of his character for truth, and the right of defendant to inquire into the good faith of defendant's prosecution, entitled the defendant to cross-examine Croft with generous liberality.

V.   Defendant assigns error in not sustaining defendant's petition for new trial filed July 12, 1948, after judgment was entered against defendant and after he had appealed to this court. Hearing was had before the trial court on the petition as amended and the motions attacking it, and the court sustained the State's motion to strike and dismissed the petition by order made on September 24, 1948. Defendant appealed from the order,

and the matter has been presented in this appeal from the judgment of January 31, 1948.

Defendant's petition for new trial was based upon the affidavit made by Elmer G. Croft after he was returned to the penitentiary and after the judgment was entered against him, and after the term of court in which it was entered, and after this appeal was taken. He stated in said affidavit that he had testified falsely in the trial against Hild through the insistence and promises of those prosecuting that he would be taken care of and pardoned or paroled very soon, and that there were no false claims filed against Polk County to obtain anything for Hild, and that he never paid any money to Hild except the money he owed him on the Dodge car of defendant, which Croft had sold. Affidavits were filed by the county attorney, the assistant county attorney, and the sheriff, of Polk County, denying the statements in the Croft affidavit relative to any promises made to him.

The trial court in denying the petition made no findings of fact but ruled that since the case had been appealed to the supreme court, the district court had no jurisdiction of the matter, and sustained the State's motion to strike the petition.

The petition asked for a new trial and since the reversal of the judgment of the district court carries with it a new trial for defendant on the indictment, it is not necessary to pass upon the trial court's order striking defendant's petition.

The judgment of the district court is reversed.—Reversed.

All JUSTICES concur.